107909

[Electronically Filed]

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF KENTUCKY

| | |
|---|---|
| MATTHEW and DANIELLE HOLMES, 30 Mount Holly Avenue, Mount Holly, New Jersey 08060, on behalf of themselves and all other similarly situated, | Civil Action No.   5:08CV-205-R |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | |
| COUNTRYWIDE FINANCIAL CORPORATION, a California corporation; BANK OF AMERICA CORPORATION, a North Carolina corporation; COUNTRYWIDE BANK, FSB, a California corporation; COUNTRYWIDE HOME LOANS, INC., A DIVISION OF COUNTRYWIDE BANK, FSB, a California corporation; FULL SPECTRUM LENDING DIVISION, a California corporation; Rene L. Rebollo, Jr.; Wahid Siddiqi; Doe's 1-50; ABC Corporations 1-50; and XYZ Partnerships and Associations 1-50. | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

## TABLE OF CONTENTS                                    Page

Class Action Complaint ...............................................................................................1

Nature of the Case.....................................................................................................1

Summary of Claims ..................................................................................................1

Jurisdiction and Venue..............................................................................................4

The Parties ................................................................................................................5

      Plaintiffs .........................................................................................................5

      Defendants .......................................................................................................6

Plaintiff Class Allegations .......................................................................................8

Numerosity ...............................................................................................................9

Common Questions of Law and Fact........................................................................9

Typicality ...............................................................................................................11

Adequacy of Representation ...................................................................................11

Superiority ..............................................................................................................11

Factual Background ................................................................................................12

Countrywide's Privacy Policy................................................................................14

Details of the Fraudulent Scheme and Conspiracy to Breach
the Personal Confidential Information of Plaintiffs and the Class ...............................16

Defendants, Rene L. Rebollo and Sub-Prime Mortgage Lender,
Full Spectrum Lending ...........................................................................................24

Defendant Wahid Siddiqi........................................................................................27

Prior Breaches of Personal Confidential Information at Countrywide.........................28

Defendants= Fraudulent Scheme and Conspiracy and Concealment
of the Same ............................................................................................................29

Count I Unjust Enrichment ...................................................................................32

Count II Fraud..........................................................................................................33

Count III Breach of Contract  ................................................................................35

Count IV Breach of Covenant of Good Faith and Fair Dealing ...........................36

Count V Breach of State Security Notification Laws............................................37

Count VI Conspiracy ...............................................................................................41

Count VII Violations of the Consumer Fraud Laws ............................................43

Count VIII Intentional Violation of the Fair Credit Reporting Act.....................47

Count IX Negligent Violation of the Fair Credit Reporting Act ...................51

Prayer for Relief.......................................................................................................52

Jury Demand .............................................................................................................54

Plaintiffs, Matthew and Danielle Holmes ("Plaintiffs"), on behalf of themselves and all others similarly situated in the State of New Jersey and throughout the country, by and through their attorneys, allege as follows:

## CLASS ACTION COMPLAINT

Plaintiffs bring this Complaint on their own behalf, and on behalf of all others similarly situated, to obtain declaratory and injunctive relief, damages (including compensatory, statutory, exemplary and punitive damages), costs of suit, attorneys= fees and other appropriate relief from the Defendants.  Plaintiffs complain and allege, upon information and belief, as follows:

## NATURE OF THE CASE

1.      This case is brought by Plaintiffs as a class action on behalf of more than two million people who have had their personal identifying and financial information accessed without their authorization and sold illegally as a result of the negligence, unfair and deceptive acts and practices and unconscionable business practices of the Defendants.  The case seeks to remedy the harmful effects of the breach of their privacy interests, failure to timely and reasonably notify them of the breach in accordance with the laws of most States, including New Jersey, and the misleading and deceptive notification and purported remedy ultimately provided by Defendants.

## SUMMARY OF CLAIMS

2.      During the period from at least July 2006 through the present (hereinafter the "relevant time period"), the exact dates of which are unknown by the Plaintiffs or any member of the Class at this time, all Defendants caused personal identifying and financial information about Plaintiffs and the Class to be accessed, collected, downloaded, saved, distributed, transferred and sold to various individuals and entities without their knowledge or consent.  The corporate Defendants then failed to timely and reasonably notify Plaintiffs and the Class of such unauthorized

1

access and breach of their privacy interests, which notice is explicitly required by the laws of New Jersey and forty-three (43) other States, the District of Columbia and Puerto Rico. And, the notice that was finally sent months later was materially false and misleading as to the nature and scope of the breach (that was fully known by Defendants at the time) and appeared to be directed at promoting a sub-standard credit monitoring service (owned in part by certain corporate Defendants) in exchange for a wholesale waiver of the existing rights of Plaintiffs and the Class.

3.    The personal identifying and financial information consisted of at least the following:

    a.    the names of Countrywide present and former customers, (including surnames, aliases, pre-and post-marital names, and the names of relatives and friends),

    b.    their addresses (including email addresses),

    c.    their phone numbers (including unlisted phone numbers),

    d.    their Social Security numbers,

    e.    their financial account information (including banking, credit card, loans and other financial account numbers),

    f.    their income information,

    g.    their monthly debt,

    h.    their employment information,

    i.    their credit scores, and

    j.    their interest rates, loan amounts and balances on existing credit loans with Countrywide and other Lenders.

The above information is hereinafter collectively referred to as "Personal Confidential Information".

4.     Defendants Countrywide Financial Corporation, Countrywide Bank, FSB, Countrywide Home Loans, Inc., Full Spectrum Lending Division, and Bank of America Corporation (collectively "Countrywide"), are in the business of selling credit financial services, including mortgage financing.

5.     Throughout the relevant time period, an employee of Countrywide by the name of Rene L. Rebollo Jr. ("Rebollo") systematically downloaded the Personal Confidential Information of Plaintiffs and members of the Class, and unlawfully marketed and sold the same to Defendant, Wahid Siddiqi, and others not yet fully known to Plaintiffs (but who are named herein as "Doe" Defendants, *i.e.* Doe's 1-50, ABC Corporations 1-50 and XYZ Partnerships and Associations 1-50).

6.     The unfair and deceptive practices relate to, *inter alia*, the following:

a.     Misrepresenting that Personal Confidential Information would be kept secure;

b.     Failing to take reasonable and necessary precautions, in accordance with the law, to secure Personal Confidential Information, especially after there had been a prior breach by a Countrywide employee in 2005;

c.     Failing to timely and reasonably notify Plaintiffs and the Class of the breach and sale of the Personal Confidential Information after it was discovered;

d.     Misrepresenting the nature and extent of the breach of Personal Confidential Information in the Letter notifying the Class of the breach;

e.     Misleading the Class as to the nature of the credit monitoring service being provided;

f.     Omitting material information from the letter notifying the Class of the breach; and

g.     Failing to take reasonable and necessary steps to prevent the future use and sale of Personal Confidential Information of Plaintiffs and the Class by the Doe Defendants.

3

7.     As a direct and proximate result of the above-described acts and omissions of Defendants, Plaintiffs and the Class have suffered injury, damages and ascertainable losses detailed herein by having their Personal Confidential Information sold to Defendant Siddiqi and the Doe Defendants for future unauthorized commercial use of such information.

8.     On behalf of Plaintiffs and the Class, this action seeks to have this Court declare such acts and omissions unlawful, to enjoin such acts and omissions from continuing to harm Class members, to ascertain the identities of the Doe Defendants forthwith so that they may be enjoined form the further use and sale of Personal Confidential Information, to enjoin Countrywide from seeking to further compromise the rights of Class members by soliciting waivers of such rights through misleading offers of "free" credit protection, and to remedy the effects of the harm through appropriate equitable relief and an award of damages, including restitution, disgorgement, statutory and punitive damages.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction over this action pursuant to Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because Plaintiffs and Class members are of diverse citizenship from the Defendants and over two-thirds of the Class resides outside of New Jersey. According to Countrywide more than 2 million Class members nationwide had their Personal Confidential Information accessed and stolen.  The aggregate amount in controversy exceeds $5,000,000.

10.     This Court has personal jurisdiction over the parties because the Countrywide Defendants conduct substantial business in this State, have had systematic and continuous contacts within this State, and have agents and representatives that can be found in this State.

11.     The Court has jurisdiction over the individual Defendants because they have had sufficient minimum contacts with and/or have purposefully availed themselves of the laws and markets of the State of Kentucky through, among other things, their conspiratorial communications between themselves and with others (including telephonic and electronic communications) and their receipt, marketing, sale and distribution of the Personal Confidential Information of Kentucky residents.

12.     Under 28 U.S.C. § 1391, venue is proper in this District because Defendants engaged in substantial conduct relevant to the claims Plaintiffs and the Class, and caused harm to members of the Class in this District.

## THE PARTIES

### Plaintiffs

13.     Plaintiffs, Matthew and Danielle Holmes, are husband and wife, individuals and residents of the State of New Jersey residing at 30 Mount Holly Avenue, Mount Holly, New Jersey 08060.

14.     Plaintiffs and the Class applied for, and in some but not all cases, received mortgage and/or other credit loans issued by Countrywide.  As part of the credit loan application process, Plaintiffs and the Class were required to provide Personal Confidential Information to Countrywide pursuant to an agreement that the Personal Confidential Information would be adequately protected from unauthorized access by others.

15.     Accordingly, Plaintiffs and the Class suffered direct injury and damages as a result of the breach of that agreement, the negligence of Defendants and the acts and omissions and unlawful conduct of all of the Defendants set forth herein.

**Defendants**

16.     Defendant, Countrywide Financial Corporation ("Countrywide Financial"), is a Delaware corporation with its principal place of business located in Calabasas, California, and is a wholly-owned subsidiary of Bank of America corporation.  Founded in 1969, Countrywide Financial is a diversified financial marketing and service holding company engaged primarily in residential mortgage banking and related business.

17.     Defendant, Countrywide Bank, FSB. ("Countrywide Bank") is a division of Countrywide Financial and is a Delaware corporation with its principal place of business located in Calabasas, California, and is a wholly owned subsidiary of Countrywide.

18.     Defendant, Countrywide Home Loans, Inc. ("Countrywide Home"), is a division of Countrywide Bank and is a Delaware corporation with its principal place of business located in Calabasas, California and is a wholly owned subsidiary of Countrywide Financial.

19.     Defendant, Full Spectrum Lending ("Full Spectrum"), is a division of Countrywide Bank and is a Delaware corporation with its principal place of business located in Calabasas, California and offices in Pasadena, California, and is a wholly owned subsidiary of Countrywide Financial.

20.     Defendant, Bank of America Corporation ("Bank of America"), is a Delaware corporation and has its principal place of business located in Charlotte, North Carolina.  Bank of America provides financial and banking services throughout the United States.

21.     Defendant Rene L. Rebollo, Jr. ("Rebollo") was at all times material hereto an employee of Countrywide and is an individual and resident of the State of California residing in Pasadena, California.   Upon information and belief, Defendant Rebollo was terminated by Countrywide only after he was arrested by prosecutive authorities.

22.     Defendant Wahid Siddiqi ("Siddiqi") is an individual and resident of the State of California, residing in Thousand Oaks, California.

23.     Defendants Doe's 1-50, ABC Corporations 1-50 and XYZ Partnerships and Associations (collectively "the Doe Defendants") are persons and entities who have received from Defendant Rebollo the Personal Confidential Information of Plaintiffs and the Class.  The identities and locations of the Doe Defendants are not yet known, but are knowable by reason of the fact that the criminal complaints filed against Defendants Rebollo and Siddiqi detail multiple instances of unauthorized distribution and sale of the Personal Confidential Information of Plaintiffs and the Class.  For instance, the Affidavit of Special Agent Richard P. Ryan filed July 31, 2008, (attached hereto as Exhibit "G", ("Ryan Affidavit") cites as probable cause to believe a crime had been committed the fact that Rebollo "had provided various mortgage brokers and lead brokers Countrywide Home Loan data", which included the Personal Confidential Information of Plaintiffs and the Class.  These "various mortgage brokers and lead brokers", among others, are Doe Defendants herein.

24.     The foregoing Countrywide defendants, the individual defendants and the various ADoe@ defendants, are collectively referred to herein as "Defendants."

25.     The acts alleged in this Complaint to have been done by each of the Defendants were authorized, ordered, done and/or ratified by their respective officers, directors, agents, employees or representatives while engaged in the management, direction, control or transaction of their respective business affairs.

26.     Various persons and/or firms, not named as Defendants herein, have participated as

co-conspirators in the violations alleged herein and have performed acts and made statements or

omissions in furtherance thereof.  Those known to exist and reasonably identifiable are named herein

as "Doe" Defendants.

## PLAINTIFF CLASS ALLEGATIONS

27.     Plaintiffs seek to bring this case as a class action pursuant to Rule 23 of the Federal

Rules of Civil Procedure, on behalf of themselves and all others similarly situated in New Jersey and

throughout the country as members of a proposed Class and Sub-Class defined as follows (the

AClasses@):

### Countrywide Customer Class

All customers of Countrywide in New Jersey and throughout the country (including the District of Columbia and Puerto Rico) who, during the period beginning at least July 2006 through at least August 2008 had their Personal Confidential Information accessed and disseminated by Defendant Rebollo. Excluded from the Class are Defendants, any entity in which a Defendant has a controlling interest, and their legal representatives, heirs, successors, and any governmental entities.

### Countrywide Former Customer Sub-Class

All former customers of Countrywide in New Jersey and throughout the country (including the District of Columbia and Puerto Rico) who otherwise meet the Class definition but, by reason of their having had their credit applications denied, paid off their loans, or otherwise terminated their relationship with Countrywide and thus were not current customers of Countrywide at the time Rebollo made his unauthorized access to their Personal Confidential Information. Excluded from the Sub-Class are Defendants, any entity in which a Defendant has a controlling interest, and their legal representatives, heirs, successors, and any governmental entities.

<u>**NUMEROSITY**</u>

28.     The proposed Class is so numerous that joinder of all of its members is impractical. Hundreds of thousands of consumers each year make application for credit from Countrywide, including mortgages and other credit instruments.  As part of the application process, Class members are required by Countrywide to submit Personal Confidential Information.  Of those who make application for credit, some are not approved by Countrywide and their applications are rejected. Others have either paid off their loans with Countrywide, either themselves or by other mortgage financing companies.  On information and belief, this group of former customers includes thousands of people located throughout the country.   Consequently, the proposed Sub-Class also is so numerous that joinder of all its members is impractical.

<u>**COMMON QUESTIONS OF LAW AND FACT**</u>

29.     Virtually all of the issues of law and fact in this class action are common to the Class and include at least the following:

    i.   Whether Defendants received and stored Personal Confidential Information of members of the Class;

    ii.   Whether Countrywide failed to take reasonable and necessary precautions to protect the Personal Confidential Information of Plaintiffs and the Class;

    iii.   Whether Defendants caused the Personal Confidential Information of Plaintiffs and the Class to be accessed and sold without authorization;

    iv.   Whether Countrywide failed to timely and reasonably notify Plaintiffs and the Class of the breach of the Personal Confidential Information;

    v.   Whether Countrywide's notification contained false or misleading information and/or failed to inform Plaintiffs and the Class of material information;

    vi.   Whether Defendants conspired and agreed amongst themselves and with others to obtain unauthorized access to the Personal Confidential Information of Plaintiffs and the Class;

vii.  Whether the Defendants engaged in a conspiracy and/or a pattern and practice of deceiving and defrauding the Class and concealing their conduct and conspiracy;

viii.  Whether the scheme and conspiracy alleged was implemented;

ix.  Whether Defendants were unjustly enriched by their acts and omissions at the expense of Plaintiffs and the Class;

x.  Whether Defendants defrauded Plaintiffs and the Class;

xi.  Whether Defendants breached their agreements with Plaintiffs and the Class;

xii.  Whether Defendants violated the duty of good faith and fair dealing in their agreements with Plaintiff and the Class;

xiii.  Whether Defendants complied with the Gramm-Leach-Bliley Act with respect to their receipt and handling of the Personal Confidential Information of Plaintiffs and the Class;

xiv.  Whether Defendants complied with the security notification laws of new Jersey and other States upon learning of the breach of the Personal Confidential Information of Plaintiffs and the Class;

xii.  Whether the Defendants violated the consumer protection laws of New Jersey and other States through their acts and omissions set forth in this Complaint;

xiii.  Whether Plaintiffs and members of the Class are entitled to declaratory and injunctive relief as to Defendants= conduct;

xiv.  Whether Plaintiffs and the members of the Class are entitled to compensatory damages, and, if so, the nature of such damages;

xv.  Whether Plaintiffs and the members of the Class are entitled to statutory damages, and, if so, the nature of such damages; and

xvi.  Whether Plaintiffs and members of the Class are entitled to an award of punitive damages, reasonable attorneys= fees, prejudgment interest, post-judgment interest, costs of suit, and other appropriate relief under the circumstances of this case.

## TYPICALITY

30.     Plaintiffs' claims are typical of the claims of other members of the Class.  Plaintiffs and all members of the Class sustained injury as a result of the unlawful disclosure of their Personal Confidential Information, which injuries were directly caused by the Defendants= acts and omissions. As detailed herein, Plaintiffs' injuries included not only the threat of privacy invasion and identity theft, but actual theft in the form of use of their Personal Confidential Information by unauthorized persons which caused their credit to be adversely affected.

## ADEQUACY OF REPRESENTATION

31.     Plaintiffs can and will fairly and adequately represent and protect the interests of the Class and Sub-Class, and Plaintiffs have no interests that conflict with or are antagonistic to the interests of Class or Sub-Class members.  Plaintiffs have retained attorneys competent and experienced in class actions, including consumer fraud class actions.  No conflict exists between Plaintiffs and the Class members.

## SUPERIORITY

32.     A class action is superior to any other available method for the fair and efficient adjudication of this controversy and common questions of law and fact overwhelmingly predominate over any individual questions that may arise.

33.     The prosecution of separate actions by individual members of the plaintiff Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class.   These adjudications would establish incompatible standards of conduct for the Defendants which would, as a practical matter, be disparities of the claims of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

34.     Defendants have acted or refused to act on grounds generally applicable to all members of the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

35.     Accordingly, class certification is appropriate under Rule 23(b)(1)(A), 23(b)(1)(B), 23 (b)(2) and 23(b)(3).

### FACTUAL BACKGROUND

36.     Defendant Countrywide is a diversified financial marketing and service holding company engaged in real estate finance-related businesses, including mortgage banking, banking and mortgage warehouse lending, securities and insurance underwriting.

37.     On July 1, 2008, Countrywide Financial merged with Bank of America and has continued operating under the name Countrywide Financial Corporation.

38.     Countrywide can obtain customers by purchasing already established mortgages from other companies.  In addition, customers can open an account with Countrywide either by calling the toll-free Countrywide customer service line, filling out a preliminary application online, or visiting and completing account application forms at one of many Countrywide store locations located nationwide, including in New Jersey.

39.     Depending on the amount and type of loan being sought, a potential customer seeking to open an account with Countrywide may be required to provide his or her Personal Confidential Information, including, but not limited to, their name, date of birth, Social Security number, current contact information, banking information, (including bank account numbers, and the amounts contained in each personal bank account), credit history, (including prior loans, credit card debt, and a certified credit history report), employment information, (including paycheck stubs), and other relevant personal and financial information.

40.     Once the application is completed and all required supporting documents are submitted, Countrywide may take between two business days to several weeks to approve or deny the application.  Once the application is approved, and an account is set up, the Countrywide customer typically receives monthly statements for payments in the mail.  Countrywide also sends to its customers a statement as to its policy of protecting Personal Confidential Information.  A Countrywide customer also may set up an online account to automatically receive and pay statements online through the use of the customer's credit card.  If an application is denied, Countrywide maintains the Personal Confidential Information of those applicants.

41.     According to the Countrywide Defendants, they "collect and maintain customer and former customer data." *See* "privacy and security in the Countrywide family" available at http://my.Countrywide.com/privacy.aspx.  (last visited November 14, 2008) (Attached hereto as Exhibit "A" hereto).  Defendants' Privacy Policy explicitly states:

"We collect information:

- You provide us on applications and other forms (such as your phone, Social Security and account numbers, assets, income and employment history);

- About your transactions with us (such as your loan balance, payment history and other account information);

- About your credit history from a credit reporting agency;

- About you or your property from business partners and service providers (such as a property appraisal, purchase contract or membership number);

- About you or your property from business partners and service providers (such as a property appraisal, purchase contract or membership number), or from current or past employers or other financial institutions when verifying information you provide on an application or other form; and

- About you from consumer purchasing and census data providers to develop competitive marketing programs for our customers.

We disclose some of this data to third parties (such as credit reporting agencies,

13

regulators and loan investors).  We may share some of this information with companies performing services on our behalf (such as the vendor who prepares our monthly statements).  These service providers agree to keep the information confidential and not use it for any other purpose."

42.     Plaintiffs and the Class relied upon these statements of privacy and security to their detriment.

43.     Plaintiffs and the members of the Class did not authorize the employees of the Countrywide Defendants, or any other Defendant named herein, to access their Personal Confidential Information for purposes of downloading, saving, marketing, selling, brokering, or otherwise disseminating and selling such information to unauthorized third parties, including Siddiqi and the Doe Defendants.

### Countrywide's Privacy Policy

44.     Defendants have represented to Plaintiffs and the Class that they understand the value of protecting Personal Confidential Information.  The document attached hereto at Exhibit "B" was sent to Plaintiffs and was relied upon by them in providing their Personal Confidential Information.  Upon information and belief, it is alleged that the same is true of the Class.

45.     Defendants promised to "safeguard" their customers' data by:

- setting policies and procedures for carefully handling customer information;

- limiting employee access to sensitive information;

- protecting against unauthorized access to customer data using data encryption, authentication, and virus detection technology;

- requiring service providers who do business with Countrywide to comply with privacy laws;

- adding company security practices;

- monitoring Countrywide websites through recognized online privacy and

14

security organizations such a Sybertrust Corporation; and

- conducting background checks on all employees and providing privacy training.

46.     The Countrywide Defendants specifically state, on their "privacy and security in the Countrywide family" website, that the company "(1) protects the confidentiality of Social Security numbers, (2) prohibits unlawful disclosure of Social Security Numbers, and (3) limits access to Social Security Numbers."  Exhibit "A".

47.     Further, the Countrywide Defendants recognize the significant problems and harms caused by identity theft, defined by Countrywide as "when someone takes and uses your personal information (such as your name, social security or credit card number) without your permission to commit fraud on other crimes."  Countrywide further explains that "[t]hese criminals take the identities of others to open new credit cards; obtain phone or utility accounts, loans, or employment; open bank accounts; and/or pass fraudulent checks."  *Id.*

48.     Countrywide provides details as to the harm that is suffered by the victims of identity theft as follows:

> "Identity thieves can damage the credit reputations and lives of victims. Studies have shown that victims spend an average of $808 and 205 hours resolving the identity theft.  Time and money is spent clearing credit reports, reporting the theft to lenders and merchants, and filing complaints with law enforcement and governmental agencies.  One of the menacing problems with identity theft is that it can happen more than once.  Once the initial incident is resolved, the thief may begin using the victim's identity again after waiting 6 months to a year and the cycle begins all over again."

*Id.*

49.     The Countrywide Defendants failed to follow their own standards for appropriate security measures, as outlined in the above-mentioned Countrywide privacy policy, and thereby breached their duty of care to and agreement with their customers, both present and former.  Among other things, the Countrywide Defendants failed to detect security breaches by one of their

15

employees occurring over the course of two years and under circumstances that a reasonably prudent company would have detected.  This was the second such occurrence.  Once discovered, they failed to take appropriate steps to stop such breaches.  Indeed, were it not for the independent effort of the Federal Bureau of Investigation, the breaches likely would be continuing today undetected by the Countrywide Defendants.

## DETAILS OF THE FRAUDULENT SCHEME AND CONSPIRACY TO BREACH THE PERSONAL CONFIDENTIAL INFORMATION OF PLAINTIFFS AND THE CLASS

50.     On or about October 26, 2007, Plaintiffs, Mr. and Mrs. Holmes, refinanced their existing mortgage for their primary residence located at 30 Mount Holly Avenue in Mount Holly, New Jersey.  The refinancing, which was arranged through Mortgage Now, Inc., an Ohio-based corporation located at 750 West Resource Drive in Brooklyn Heights, Ohio, provided the Holmes with a 30-year mortgage.  The Holmes offered up their residence as collateral against the refinancing agreement.  Further, by the terms of the agreement, they were obligated to make PMI (mortgage insurance) payments throughout the term of the refinancing, as further security against any loan default.  Accordingly, there was no need for Countrywide to maintain the Personal Confidential Information of Plaintiffs after October 2007.

51.     As part of the Holmes' refinancing application process, Plaintiffs, like other members of the Class who have applied for similar loans and lines of credit, provided the mortgagor with their Personal Confidential Information, including their names, addresses, Social Security numbers, employment history, prior tax returns, and other personal identifying and financial information.  This disclosure was made with both express and implicit assurances, upon which Plaintiffs relied, that the

Holmes' Personal Confidential Information would remain confidential and not be disseminated in

16

any unauthorized manner.

52.     On or about November 19, 2007, as part of a "welcome package" from Countrywide Bank, the Holmes' received a <u>Notice of Assignment, Sale, or Transfer of Servicing Rights</u> (hereinafter "Notice of Assignment") stating that Mortgage Now, Inc., the broker who had negotiated and executed the Holmes' refinancing agreement, had transferred their home loan to Countrywide Bank.  See Notice of Assignment attached as Exhibit "C" hereto.  Therefore, per the Notice of Assignment, effective December 1, 2007, Mr. and Mrs. Holmes became Countrywide customers.

53.     The Notice of Assignment states: "to ease any concerns [the Holmes'] have about this process[ , ] [p]lease note the terms and conditions of your home loan documents do not change in any way, other than terms directly related to the servicing of your home loan."   *Id.*   Further, included in the Countrywide-described "welcome package" was a pamphlet entitled "Your Privacy" (hereinafter "Privacy Pamphlet").   *See* Privacy Pamphlet attached as Exhibit "B" hereto.   The Privacy Pamphlet was meant to "explain[ ] how [Countrywide] protect[s] and use[s] [customer's] information in a safe, secure and responsible manner."   *Id.*

54.     The Privacy Pamphlet states, in relevant part:

YOUR PROTECTION IS OUR PRIORITY

> We strive to safeguard your data.  We do this by:
>
> - setting policies and procedures for carefully handling your information;
> - limiting employee access to sensitive information;
> - protecting against unauthorized access to customer data using data encryption, authentication, and virus detection technology;
> - requiring service providers who do business with us to comply with privacy laws;
> - adding company security practices; and
> - conducting background checks on all employees and providing privacy training.

*       *       *

HOW WE OBTAIN AND USE INFORMATION

To provide you with banking products and services, comply with government regulations, improve our products and services, and better understand your financial needs, we collect and maintain customer and former customer data. We collect information:

- you provide us on applications and other forms (such as your name, Social Security Number, driver's license or other government identification numbers);
- you provide us in our communications with you (such as by telephone, fax, mail, e-mail and surveys);
- about your account activity and transactions with us, our affiliates, business partners or others we work with to provide you financial products or services (such as your account balance, transaction history and other account information);
- about your credit history from a credit reporting agency;
- about you from business partners and service providers (such as a property appraisal, purchase contract or membership number) or from current or past employers or other financial institutions when verifying information you provide on an application or other form; and
- about you from consumer purchasing and census data providers to develop competitive marketing programs for our customers.

We disclose some of this data to third parties (such as credit reporting agencies and regulators). We may share some of this information with companies performing services on our behalf (such as the vendors who prepare monthly customer statements). These service providers agree to keep the information confidential and not use it for any other purpose.

*       *       *

PROTECTING YOUR IDENTITY

Identity theft is one of the fastest growing crimes in America. We understand the implications identity theft can have and take very specific steps to reduce the chance that identity thieves can damage the credit reputations of our customers. See our website at www.countrywidebank.com and click "Privacy and Security" for more information on identity theft and how to protect yourself.

55.    Since 2007, the Holmes have relied on the representations concerning the specific

steps Countrywide takes to reduce the chance that they could become victims of identity theft, and

18

further have relied on Countrywide's assurance that the company "strive[d] to safeguard [their] data." Since the Holmes' mortgage was transferred to Countrywide, effective December 1, 2007, they have dutifully submitted monthly payments directly to Countrywide Bank and have maintained their account with Countrywide.

56.     Neither Plaintiffs nor any member of the Class of Countrywide customers authorized Defendant Rebollo to access their Personal Confidential Information over the course of two years for purpose of downloading, saving, marketing, selling, or otherwise disseminating such information to unauthorized third parties, including Sidiqqi and the Doe Defendants, for money.

57.     Throughout the relevant time period, neither Plaintiffs nor members of the Class of Countrywide customers were aware of the scheme and conspiracy set forth herein.

58.     Shortly after September 5, 2008, Plaintiffs received a letter from Beneficial, care of HSBC Auto Finance, ("the Beneficial Letter") informing them that a purported "recent credit request for the financing of a motor vehicle" had been denied for a variety of reasons including, among other things, the "number of inquiries within last 3 months". *See* Beneficial Letter at Exhibit "D" hereto. The Beneficial Letter, which was addressed to both Mr. and Mrs. Holmes, further stated the decision to deny auto financing was based in whole or in part on information obtained in a credit report received from TransUnion.

59.     Prior to their receipt of the Beneficial Letter, Plaintiffs were unaware that someone had sought to obtain credit financing of an automobile in their names.

60.     Prior to receiving the September 5, 2008, Beneficial Letter, neither Mr. nor Mrs. Holmes had applied for a credit request for the financing of a motor vehicle from Beneficial, HSBC

19

Auto Finance.

61.     Prior to their receipt of the Beneficial Letter, and for a period dating back to at least July 2006 [the date Rebollo is alleged to have begun his scheme to access and sell the Personal Confidential Information of Plaintiffs and the Class], Plaintiffs had received no notice of any credit inquiry involving them.

62.     On information and belief, based upon the fact that Plaintiffs made application for mortgage financing in 2007 and their loan was assigned to Countrywide in November 2007, it is alleged that Rebollo made unauthorized access to and downloaded the Personal Confidential Information belonging to Plaintiffs.  Mr. Holmes' receipt of the Countrywide Letter confirms that at least his Personal Confidential Information was accessed by Rebollo without his authorization.

63.     On September 6, 2008, one day after the date of the Beneficial Letter, Plaintiff Matthew Holmes (but not his wife) received a letter from Countrywide ("the Countrywide Letter"), informing him that Countrywide purportedly "*recently* became aware that a Countrywide employee (now former) *may have sold* unauthorized personal information about [him] to a third party." Exhibit "E" (emphasis supplied).  The Countrywide Letter further stated that "[b]ased on a joint investigation conducted by Countrywide and law enforcement authorities, it was determined that the customer information involved in this incident included your name, address, Social Security number, mortgage loan number, and various other loan and application information."  The Countrywide Letter was not addressed to Mr. Holmes' wife, Danielle, nor did she receive a Countrywide Letter of her own.

64.     The Countrywide Letter confirms that "it was determined that the customer information involved in this incident included [Mr. Holmes'] name, address, Social Security number,

mortgage loan number, and various other loan and application information." *See* Exhibit "E" hereto. A "Consumer Privacy Alert" at Countrywide's website http://my.Countrywide.com/media/securityalert.html explains that "various other loan and application information" could include "contact information – such as phone numbers and email addresses – and application and loan information – such as notified customer's income information, monthly debt, employment information, credit score, interest rate, and loan amount and balance." *See* Exhibit "F" hereto.

65.     The foregoing statements were false and misleading insofar as Countrywide knew months before sending the Countrywide Letter that Personal Confidential Information had been accessed and sold without authorization.

66.     The Countrywide Letter, which was dated at least two (2) months after Countrywide reasonably became aware of the breach of the Personal Confidential Information of Plaintiffs and the Class by Rebollo, stated that Countrywide "deeply regret[s] this incident and apologize[d] for any inconvenience or concern it may cause you."  After affirming its "responsibility to safeguard" the Personal Confidential Information of Countrywide customers, the Countrywide Letter went on to state also that Countrywide had "terminated the (responsible) individual's access to customer information" and then vaguely reported that "he is no longer employed by Countrywide."  The Countrywide Letter further stated that "Countrywide will continue to work with law enforcement authorities to pursue further actions as appropriate."

67.     The Countrywide Letter then states, without detail, that "if you are a current Countrywide mortgage holder, we will take necessary precautions to monitor your mortgage account and will notify you if we detect any suspicious or unauthorized activity related to this incident.  We will also work with you to resolve unauthorized transactions on your Countrywide mortgage account

related to this incident if reported to us in a timely manner." The letter does not mention any specifics of purported "precautionary measures" allegedly being taken by Countrywide for the benefit of the Countrywide Former Customer Sub-Class, who supplied Personal Confidential Information to the company in their credit applications, which information was being held by Countrywide at the time of the serial breaches by Rebollo. Accordingly, even assuming Countrywide made the requisite disclosure of the breaches to the Countrywide Former Customer Sub-Class, strict proof of which is demanded at trial, the "precautionary measures" allegedly being provided by Countrywide did not apply to them.

68. Lastly, the Countrywide Letter states that "[a]s an additional measure of protection, Countrywide has arranged for ***complimentary*** credit monitoring services provided by a Countrywide vendor ***at no cost to you*** over the next two years." The letter reiterates that the service is to be free by emphasizing that **"[y]ou will not be billed for this service."**

69. These statements are false and misleading as there is a substantial "cost" being paid by members of the Class in having to surrender substantial rights in order to obtain the "complimentary" credit monitoring service. The letter goes on to explain that Countrywide has engaged ConsumerInfo.com, Inc., an Experian® Company, to provide at [the victim's] option, a two-year membership in Triple Advantage Credit Monitoring…(which) includes daily monitoring of (the victim's) credit reports from all three national credit reporting companies (Experian, TransUnion and Equifax) and e-mail monitoring alerts of key changes to (the victim's) credit reports." The letter does not disclose the actual relationship between Countrywide and ConsumerInfo.com, nor does it

properly advise the victim of the cost of the services offered, including that fact the substantial rights

are surrendered by accepting the credit monitoring.

70.     The Countrywide Letter makes no reference, explicitly or implicitly, to any action taken by Countrywide to assure that such breaches of Personal Confidential Information will not occur in the future, including, among other things, securing all Countrywide computers with the necessary software to prevent unauthorized access and the unauthorized downloading of Countrywide customer profiles, monitoring individual employees' access and use of Countrywide computers containing customer's sensitive identification data, and/or purging such data at some reasonable time after it no longer becomes necessary for Countrywide to maintain it (assuming it is ever necessary), especially in the case of members of the Countrywide Former Customer Sub-Class.

71.     The Countrywide Letter also fails to convey to Countrywide customers who had their Personal Confidential Information accessed and sold by Rebollo precisely when and how Countrywide became aware of the breach.   Accordingly, the Countrywide letter misleads Countrywide customers when it says the company "recently" learned of the breach, when in reality it knew of the breach months earlier.   Countrywide thus failed to reasonably inform the Class why the company chose to wait over two months after Countrywide actually became aware of the breach before notifying the affected Countrywide customers, which unexcused, substantial time lapse is believed and therefore alleged to have resulted in the unauthorized use of Private Confidential Information for commercial purposes by Siddiqi and the Doe Defendants.

72.     The Countrywide Letter makes no reference to the August 1, 2008 arrest of Rebollo, who was charged with exceeding authorized access to the Countrywide computers in connection with his fraudulent scheme and conspiracy with Siddiqi and the Doe Defendants to access the databases stored on Countrywide computers, to download Class members' Private Confidential Information and to sell the information to third parties like Siddiqi and the Doe Defendants.   Nor

does the Countrywide Letter explain why, despite the fact that the FBI had arrested Rebollo – the "employee responsible for the breach" – along with at least one other known co-conspirator, Siddiqi, Countrywide chose to wait over five weeks after the arrests to notify the victims of the breach, the Class.

**Defendants, Rene L. Rebollo and Sub-Prime Mortgage Lender, Full Spectrum Lending**

73.     Following an investigation conducted by the Federal Bureau of Investigation ("FBI"), on August 1, 2008, Rene L. Rebollo Jr., of Pasadena, California, was arrested and charged with exceeding authorized access to the computer of a financial institution in connection with Rebollo's scheme to access the databases stored on Countrywide computers, to download customers' sensitive Personal Confidential Information and to sell that information to third parties.  *See generally*, Affidavit of Richard Ryan dated July 31, 2008 at Exhibit "G" hereto.  (The facts of the Ryan Affidavit are incorporated herein by reference thereto.)

74.     At the time of his arrest, Rebollo was employed as a Senior Financial Analyst for Countrywide Home Loan's subprime mortgage division, Full Spectrum Lending, located in Pasadena, California.

75.     As described more fully below, Full Spectrum Lending has been the center of the subprime mortgage meltdown and crisis in this country.  The Countrywide subsidiary was sued by State Attorneys' General throughout the country for its unfair and deceptive practices, and Defendant Bank of America, the parent company of Countrywide, has agreed to settle the claims of the States for more than $4,000,000,000.00.

76.     Prior to his position in subprime lending with Full Spectrum Lending, Rebollo had been employed by Countrywide Home Loan's Simi Valley office in various positions for approximately nine and one-half years.  As a subprime Senior Financial Analyst, Rebollo was paid a

24

salary of $63,000 annually with a small bonus of $2,000 for a total annual compensation of $65,000.

77.     In the scope of his employment, Rebollo was provided access by Countrywide to many Countrywide Home Loan databases, which contained sensitive information, such as Social Security numbers of Countrywide customers located in New Jersey and throughout the United States including the District of Columbia and Puerto Rico.  Though most of the Countrywide Home Loan computers had a security feature which disabled the access and use of flash drives, there was at least one unsecured computer that did not have the software.  Rebollo, therefore, had access to at least one unsecured computer and used it to download and save the Countrywide Home Loan data to his thumb drive.

78.     Over the course of two years, Rebollo accessed Countrywide Home Loan databases and ran reports from the company's databases at his workspace.  Rebollo then downloaded the reports, containing Countrywide Home Loan data, including customer names, social security account numbers, telephone numbers, mortgage loan numbers, and other Countrywide Home Loan client records, onto personal "flash" drives, or "thumb" drives.  Typically, this was done on Sundays, when Rebollo was not required to be at work and did not receive any extra compensation for being at work.  However, each time, for approximately one hour, he would come to work, access the various Countrywide Home networks and databases, save the data to a thumb drive and then leave the premises.  On occasion, however, Rebollo would access and save the data during his regular hours.

79.     Although it apparently was against company policy to place thumb drives or external data storage devices into any Countrywide computers, and such policy apparently was intended to prevent the leak of Countrywide customer data – including the Personal Confidential Information at issue in this case – it is believed and therefore averred that the Countrywide Defendants failed to

25

take reasonable precautions to prevent, detect and stop (after it had begun) the systematic use of thumb drives by Rebollo off-hours over the span of two (2) years.

80.      On some occasions, Siddiqi and the Doe Defendants requested that Rebollo obtain specific types of Countrywide customer data.  For example, Rebollo was asked for "portfolio leads" or "new declines", meaning he was specifically asked to provide Personal Confidential Information of members of the Countrywide Former Customer Sub-Class.  Because of his widespread access, Rebollo was able to access these, and other specific databases to provide the information and data sought.  Plaintiffs complain that Countrywide should not be maintaining such Personal Confidential Information about its former customers, especially in a manner that puts it at risk of unauthorized access, as occurred in this case.

81.      Two databases that Rebollo accessed and saved Personal Confidential Information of Countrywide customers have been identified as those bearing the names "AS400" and "Accuate."  It is not clear how many other databases Rebollo accessed, although such information should be known by Countrywide.

82.      Rebollo personally estimated that he downloaded approximately 20,000 Countrywide Home Loan customer profiles every week for approximately two years.  Accordingly, over the course of two years, Rebollo purports to have downloaded over 2.8 million customer profiles.  The figure is likely higher because the FBI was able to arrange for the purchase of Personal Confidential Information of 38,000 Class members during a July 9, 2008 purchase from Siddiqi.

83.      Upon downloading and saving the Personal Confidential Information on his personal thumb drives, Rebollo then left Countrywide Home premises with the intent to sell the data.  He would then sell his weekly batch of approximately 20,000 Countrywide Home profiles for approximately $500.  Rebollo conducted each transaction either by selling the actual thumb drive

consisting of the customer profiles to a third party or by e-mailing the contents of the thumb drive to the buyer.  In e-mailing the sensitive information, Rebollo used both his personal home computer as well as a public computer from a local Kinko's located at 855 East Colorado Blvd, in Pasadena, California.

84.     Rebollo opened a Washington Mutual account under the name "Rene Rebollo, Doing Business As: RR Consulting", specifically for the purpose of depositing and holding the proceeds of the Countrywide Home data sales.   He estimated that over the course of two years, he profited approximately $50,000 to $70,000 in total from the sales of the Countrywide Home data.

**Defendant Wahid Siddiqi**

85.     Following the investigation conducted by the FBI, on August 1, 2008, Defendant, Wahid Siddiqi, was arrested and charged with fraud and related activity in connection with access devices.

86.     On July 7, 2008, an undisclosed confidential witness, working for the FBI, engaged in a series of telephone conversations with Siddiqi regarding the FBI's effort to purchase Personal Confidential Information of Countrywide customers.   During one of the calls, the confidential witness negotiated a price of $4,000 for the personal confidential customer profiles of approximately 38,000 Countrywide customers and a meeting was set for Wednesday, July 9, 2008 at 10:30 a.m. to purchase the data.   That day, the witness, equipped with an audio and video recording device and $4,000 provided by the FBI, met Siddiqi at the predetermined meeting place.  There, Siddiqi sold the witness two compact disks containing several spreadsheets which included, among other things, several thousand Social Security numbers.  Upon reviewing the data, the witness gave Siddiqi the $4,000.   The audio recording device recorded Siddiqi telling the witness at the time of the transaction that the leads were "fresh from Countrywide" and "will have full socials."

27

87.     An FBI review of the disks sold by Siddiqi revealed that they contained several spreadsheets in Excel format.  Each spreadsheet contained a large quantity of names and subsequent columns of data including the customers' telephone numbers, names, Social Security account numbers and mortgage loan numbers, among other data.  The FBI agent conducting the review estimated that the spreadsheets from this single transaction contained Personal Confidential Information for approximately 38,000 individuals.

88.     Copies of the spreadsheets purchased from Siddiqi on July 9, 2008, were then provided to Countrywide Home investigators for verification and authentication, who later confirmed that the data belonged to Countrywide.  It was further confirmed that the Social Security numbers associated with the names on the spreadsheets were the actual Social Security account numbers belonging to Countrywide Home account holders – i.e. Countrywide Customer Class Members – and the data corresponded to Countrywide Home records.

**Prior Breaches of Personal Confidential Information at Countrywide**

89.      The above-described event is not the first time Countrywide was involved in a serious data breach of Personal Confidential Information. Two years ago, a website known as ConsumerAffairs.com investigated the case of Joan Carpenter from Toms River, New Jersey, who received a Countrywide letter stating that an employee of Countrywide had "disclosed documents" relating to her mortgage.

90.     Ms. Carpenter was surprised to learn that the data breach impacted her because she had paid off her Countrywide loan prior to receiving the letter.  Accordingly, Ms. Carpenter is a member of the putative Countrywide Former Customer Sub-Class herein.

91.     Countrywide has refused to comment on the incident, which according to ConsumerAffairs.com, remains unresolved to this day.

92. However, the significance of this prior data breach is that Countrywide became aware that its computers and data security measures were insufficient to adequately protect the Personal Confidential Information of Plaintiffs and the Class

**DEFENDANTS= FRAUDULENT SCHEME AND CONSPIRACY AND CONCEALMENT OF THE SAME**

93. Defendants conspired and agreed to accomplish the fraudulent scheme set forth herein in order to profit from the sale of Personal Confidential Information of Plaintiffs and the Class, and they committed multiple acts in furtherance of this conspiracy which are outlined in this Complaint to fulfill this goal.

94. Specifically, in furtherance of this scheme and conspiracy to defraud Plaintiffs and the Class, Defendants created a distribution network designed to unlawfully market and sell the Personal Confidential Information of Plaintiffs and the Class to individuals and entities who were not authorized to receive, review or utilize such information. Beyond Defendant Siddiqi, the individuals and entities involved in the scheme are only broadly known to include "various mortgage brokers and lead brokers" as generally identified in the Ryan Affidavit. Accordingly, these persons and entities are named herein as the Doe Defendants.

95. Defendants implemented the scheme and conspiracy in the following manner:

    i. Arranging for and conducting the unauthorized access to Personal Confidential Information belonging to Plaintiffs and the Class from Countrywide network computers;

    ii. Arranging for and conducting the unauthorized downloading and saving on flash and thumb drives the Personal Confidential Information of Plaintiffs and the Class;

    iii.  Marketing the sale to unauthorized persons and entities (i.e. the Doe Defendants) of Personal Confidential Information belonging to Plaintiffs and the Class;

    iv.  Contacting and communicating with third parties through telephonic, electronic mail and in-person communications about the sale and purchase of Personal Confidential Information of Plaintiffs and the Class;

    v.  Distributing Personal Confidential Information of Plaintiffs and the Class to Siddiqi and the Doe Defendants with knowledge that such distribution was unauthorized;

    vi.  Exchanging money for the unauthorized sale of Personal Confidential Information belonging to Plaintiffs and the Class;

    vii.  Receiving the proceeds and benefits of their fraudulent scheme and conspiracy, including at least $50,000-$70,000 received by Rebollo and approximately four times that amount by Siddiqi;

    viii.  Working in concert to conceal their scheme and to circumvent efforts to detect their scheme by others, including those in law enforcement;

96.    Defendants concealed their fraudulent conduct from Plaintiffs and the Class by controlling the process and methodology by which they downloaded, stored, marketed, distributed and sold the Personal Confidential Information. Moreover, Defendants= fraudulent conduct was of such a nature as to be self-concealing.  Further, the Countrywide defendants concealed the nature and extent of the scheme and conspiracy after the details were fully learned, and they have yet to divulge all such details to Plaintiffs and the Class, including the names of the Doe Defendants.

97.     Plaintiffs and the Class had no knowledge of the conspiracy, or other unlawful conduct alleged herein, or of any facts that might have led to the discovery thereof in the exercise of reasonable diligence.  Plaintiffs and the Class could not have discovered the conspiracy, concerted action or other unlawful conduct alleged herein by the exercise of due diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of and to conceal their unlawful conduct and conspiracy.  These techniques of secrecy included, but were not limited to, secret meetings and communications, misstatements about the actions, omissions, and other conduct alleged herein.

98.     Plaintiffs and the Class were diligent in pursuing an investigation of the claims asserted in this Complaint once alerted to the potentiality of such claims by their receipt of the Countrywide Letter.  Through no fault of their own, they did not receive inquiry notice or learn of the factual basis for their claims in this Complaint or their injuries suffered therefrom until the earliest date of September 6, 2008, when the Countrywide Letter was sent to Plaintiffs and other members of the Class.  *See* Exhibit "E"

99.     The Defendants= failure to properly disclose their unlawful conduct and conspiracy, and other acts and omissions as alleged herein until September 6, 2008, was and is willful, intentional, wanton, malicious, outrageous, and was undertaken in deliberate disregard of, or with reckless indifference to, the rights and interests of Plaintiffs and the Class in protecting their Private Confidential Information.

100.    Because the unlawful conduct and conspiracy was kept secret by Defendants and their co-conspirators, Plaintiffs and the Class were unaware of the fact that their Personal Confidential Information had been accessed, downloaded and sold by and to unauthorized

individuals and entities, and have been unable to take reasonable and necessary precautions to secure and protect their Personal Confidential Information.

**COUNT I**
**UNJUST ENRICHMENT**

101.     Plaintiffs hereby incorporate by reference thereto the averments of paragraphs 1 through 100 hereof as if fully set forth herein and further allege as follows.

102.     By engaging in the conduct described in this Complaint, defendants have knowingly obtained benefits from Plaintiffs and the Class under circumstances such that it would be inequitable and unjust for these Defendants to retain them.

103.     Certain Defendants have collected payments from sales of Personal Confidential Information belonging to Plaintiffs and the Class.  For instance, Rebollo has collected between $50,000 - $70,000 from his sales of Personal Confidential Information.  Siddiqi has collected, at times, four times that amount from such sales.  It is believed and therefore averred that the Doe Defendants have collected similar amounts from their transactions of Personal Confidential Information belonging to Plaintiffs and the Class.

104.     The Countrywide Defendants have collected fees and payments from Plaintiffs and the Class that, if they are permitted to retain them, would cause these Defendants to be unjustly enriched.  These fees and payments include application and processing fees relating to applications for mortgages and credit from Countrywide, as well as fees being charged to members of the Class for credit monitoring services being offered by Countrywide and its joint venture company, Experian®.

105.     Thus, Defendants will be unjustly enriched if they are permitted to retain the full amounts paid to them either by purchasers of the Personal Confidential Information, or by Plaintiffs and each member of the Class, either directly or indirectly.  The claims of Plaintiffs and each

32

member of the Class seek to recover the individual payments made by Plaintiffs and the Class for the above-described fees and costs, as well as the full amount of any monies paid to any Defendant for the purchase of Personal Confidential Information.

106.    Plaintiffs and each member of the Class are therefore entitled to an award of compensatory damages in an amount to be determined at trial, or the imposition of a constructive trust upon the monies derived by Defendants by means of the above-described payments.

WHEREFORE, Plaintiffs, on behalf of themselves and each member of the Class, respectfully seek the relief set forth below.

## COUNT II
## FRAUD

107.    Plaintiffs and the Class hereby incorporate by reference thereto the averments of paragraphs 1 through 106 hereof as if fully set forth here and further allege as follows.

108.    By engaging in the acts and omissions alleged in this Complaint, Defendants have committed fraud on the Plaintiffs and the Class.

109.    Defendants have made false and fraudulent statements and material misrepresentations and omissions to Plaintiffs and the Class relating to the receipt, storage, maintenance and privacy of their Personal Confidential Information, as well as the time, place and manner of the unauthorized access to their Personal Confidential Information.   Defendants' statements were misleading, at best, and materially false and fraudulent, at worst.   In fact, the credit monitoring service being offered by Countrywide requires Plaintiffs and members of the Class to surrender substantial rights that they otherwise would retain, but for their agreement to accept the purportedly "complimentary" credit monitoring service.   Such rights include, but are not limited to, the right to pursue equitable relief and damages in court against Defendants (as opposed to agreeing to binding arbitration and a limitation of liability which caps any recovery at $100).

33

110.    Defendants intended that Plaintiffs and the Class would rely on their statements, representations and omissions to their detriment.   In particular, the Countrywide Defendants repeatedly made misrepresentations about the security of the Personal Confidential Information they were seeking from Plaintiffs and the Class.   Then, after the breach, they stated that the credit monitoring service being offered was "complimentary" and was being provided "at no cost to you over the next two years, " both of which statements were false.   Defendants also have made false and fraudulent statements and material misrepresentations and omissions to Plaintiffs and the Class respecting, *inter alia*, when they learned of the unauthorized access to the Personal Confidential Information, whether the same had been sold to others, and the nature and extent of the "credit monitoring service" being provided as an "additional measure of protection" to affected Class members including the fact that Countrywide has a financial interest in ConsumerInfo.com. Plaintiffs and the Class did in fact reasonably rely on the false representations and statements of these Defendants and suffered injury and damages thereby, as more fully set forth herein.

111.    In addition, these Defendants concealed and suppressed and/or omitted material facts as to their knowledge of the unauthorized access to and sale of Personal Confidential Information, and their subsequent actions ostensibly to protect Plaintiffs and the Class from the unlawful sale and disclosure of their Personal Confidential Information.   For instance, Defendants failed to point out that their actions provide no protection for members of the Countrywide Former Customer Sub-Class.

112.    As a result of Defendants= acts of concealment and suppression, and their misrepresentations and omissions, Plaintiffs and the Class were unaware of the above-referenced facts, and were not able to take timely action to protect themselves form the harmful effects of the unauthorized disclosure of their Personal Confidential Information.

113.     As a direct and proximate result of Defendants= fraudulent representations and omissions, and the concealment and suppression of material facts by Defendants, Plaintiffs and the Class have suffered and will continue to suffer damages.

WHEREFORE, Plaintiffs, on behalf of themselves and the members of the Class, respectfully seek the relief set forth below.

## COUNT III
## BREACH OF CONTRACT

114.     Plaintiffs hereby incorporate by reference thereto the averments of paragraphs 1 though 113 hereof as if fully set forth herein and further allege as follows.

115.     At the outset of the application process, Countrywide represented to potential customers, including Plaintiffs and members of the Class, that it required Private Confidential Information to be provided, but that Countrywide would take reasonable and necessary precautions to ensure the same would be protected.

116.     These representations and promises were made to Plaintiffs and each member of the Class, who relied upon them to their detriment.  Plaintiffs and the Class made a mutual exchange of consideration in reliance upon and acceptance of the offer of security by Countrywide.

117.     The failure of Defendants to keep secure from breach the Personal Confidential Information of Plaintiffs and the Class constitutes a material breach of the agreement between Countrywide and the Class.

118.     As a direct and proximate result of the aforesaid breaches of their agreements with Plaintiffs and the Class, Plaintiffs and the Class have been harmed.

## COUNT IV
## BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

35

119.     Plaintiffs hereby incorporate by reference thereto the averments of paragraphs 1 though 118 hereof as if fully set forth herein and further allege as follows.

120.     The general duty of good faith and fair dealing in the performance of a contract is found in Restatement (Second) of Contracts, Section 205, which provides that "every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement."

121.     In New Jersey and other States, the duty of good faith is defined as honesty in fact in the conduct or transaction concerned.

122.     The duty to perform contractual obligations in good faith applies where the contract at issue is a consumer contract.

123.     As part of the consumer contract between Plaintiffs and the Class and Countrywide, there existed an implied covenant of good faith and fair dealing requiring Countrywide to use its best efforts to protect the Personal Confidential Information of Plaintiffs and the Class.

124.     By failing to secure the Personal Confidential Information of Plaintiffs and the Class, Countrywide breached the covenant of good faith and fair dealing.

125.     As part of the agreement between the Class and Countrywide, there existed an implied covenant of good faith and fair dealing requiring Countrywide to deal fairly with the Class with regard to timely and reasonable notification as to any breach of the Personal Confidential Information belonging to Plaintiffs and the Class.

126.     By failing to timely and reasonably notify Plaintiffs and the Class of the breach of Personal Confidential Information by Robello, Countrywide breached the covenant of good faith and

fair dealing.

127.    Such breaches of the covenant of good faith and fair dealing by Defendants were the direct and proximate result of injury and damages to Plaintiffs and the Class.

128.    As a result of the breaches of the covenant of good faith and fair dealing by Defendants, Plaintiffs and the Class have been harmed.

**COUNT V**
**BREACH OF STATE SECURITY NOTIFICATION LAWS**

129.    Plaintiffs and the Class hereby incorporate by reference thereto the averments of paragraphs 1 through 128 hereof as if fully set forth here and further allege as follows.

130.    At least forty-four States, the District of Columbia and Puerto Rico have enacted legislation requiring notification of security beaches involving personal information, including the following:

   a.   Alaska, 2008 H.B. 65

   b.   Arizona, Ariz. Rev. Stat. § 44-7501 (2007 S.B. 1042, Chapter 23)

   c.   Arkansas, Ark. Code § 4-110-101 *et seq.*

   d.   California, Cal. Civ. Code §§ 56.06, 1785.11.2, 1797.29, 1798.29, 1798.81.5, 1798.82, 1798.84

   e.   Colorado, Colo. Rev. Stat. § 6-1-716

   f.   Connecticut, Conn. Gen Stat. § 36a-701(b)

   g.   Delaware, Del. Ann. Code tit. 6, §§ 12B-101 *et seq.*

   h.   Florida, Fla. Stat. § 817.5681

   i.   Georgia, Ga. Code §§ 10-1-910, -912

   j.   Hawaii, Haw. Rev. Stat. § 487N-2

   k.   Idaho, Idaho Code §§ 28-51-104 to 28-51-107

l.  Illinois, 815 ILCS 530/1 et seq.

m.  Indiana        , Ind. Code §§ 24-4.9 et seq., 4-1-11 *et seq.*

n.  Iowa, 2008 S.F. 2308

o.  Kansas, Kan. Stat. 50-7a01

p.  Louisiana, La. Rev. Stat. Ann. § 51:3071 *et seq.*

q.  Maine, Me. Rev. Stat. Ann. tit. 10 §§ 1347 *et seq.*

r.  Maryland, Md. Code, Com. Law § 14-3501 *et seq*.

s.  Massachusetts, 2007 H.B. 4144, Chapter 82

t.  Michigan, Mich. Comp. Laws § 445.61 *et seq.*

u.  Minnesota, Minn. Stat. §§ 325E.61, 325E.64

v.  Montana, Mont. Code § 30-14-1701 *et seq.*

w.  Nebraska, Neb. Rev. Stat. §§ 87-801, -802, -803, -804, -805, -806, -807

x.  Nevada, Nev. Rev. Stat. 603A.101 *et seq.*

y.  New Hampshire, N.H. Rev. Stat. §§ 359-C:19 *et seq.*

z.  New Jersey, N.J. Stat. 56:8-163

aa. New York, N.Y. Gen. bus. Law § 899-aa

bb. North Carolina, N.C. Gen. Stat § 75-65

cc. North Dakota, N.D. Cent. Code § 51-30-01 *et seq.*

dd. Ohio, Ohio Rev. Code §§ 1347.12, 1349.19, 1349.191, 1349.192

ee. Oklahoma, Okla. Stat. § 74-3113.1 and 2008 H.B. 2245

ff.  Oregon, 2007 S.B. 583, Chapter 759

gg. Pennsylvania, 73 Pa. Stat. § 2303 (2005 S.B. 712, Act 94)

hh. Rhode Island, R.I. Gen. Laws § 11-49.2-1 *et seq.*

    ii.   South Carolina, 2008 S.B. 453, <u>Act 190</u>

    jj.  Tennessee, Tenn. Code § <u>47-18-2107</u>

    kk. Texas, Tex. Bus. & Comm. Code § <u>48.001 *et seq.*</u>

    ll.   Utah, Utah Code §§ <u>13-44-101</u>, <u>-102</u>, <u>-201</u>, <u>-202</u>, <u>-310</u>

    mm.  Vermont, Vt. Stat. tit. 9 § <u>2430 *et seq.*</u>

    nn. Virginia, 2008 S.B. 307, chapter 566

    oo. Washington, Wash. Rev. Code § <u>19.255.010</u>

    pp. West Virginia, 2008 S.B. 340, <u>Chapter 37</u>

    qq. Wisconsin, Wis. Stat. § <u>895.507</u>

    rr.  Wyoming, Wyo. Stat. § <u>40</u>-12-501 to -501

    ss.  District of Columbia, D.C. Code § <u>28- 3851 *et seq.*</u>

    tt.  Puerto Rico, 2005 H.B. 1184, <u>Law 111</u>

131.    By the acts and omissions set forth herein, Defendants have violated these laws.

132.    For instance, the New Jersey law, N.J. Stat. <u>56:8-163,</u> specifically provides that.

"Any business that conducts business in New Jersey … shall disclose any breach of security of those computerized records following discovery or notification of the breach to any customer who is a resident of New Jersey whose personal information was, or is reasonably believed to have been, accessed by an unauthorized person. The disclosure to a customer shall be made in the most expedient time possible and without unreasonable delay, consistent with the legitimate needs of law enforcement, as provided in subsection c. of this section, or any measures necessary to determine the scope of the breach and restore the reasonable integrity of the data system. …

          *      *      *

Any business … required under this section to disclose a breach of security of a customer's personal information shall, in advance of the disclosure to the customer, report the breach of security and any information pertaining to the breach to the Division of State Police in the Department of Law and Public Safety for investigation or handling, which may include dissemination or referral to other appropriate law enforcement entities.

The notification required by this section shall be delayed if a law enforcement agency determines that the notification will impede a criminal or civil investigation and that agency has made a request that the notification be delayed. The notification required by this section shall be made after the law enforcement agency determines that its disclosure will not compromise the investigation and notifies that business or public entity."

N.J.S.A. 56:8-163.

133.    As described in detail above, Countrywide failed to comply with these statutory requisites by, *inter alia*, failing to disclose "in the most expedient time possible and without unreasonable delay" the fact of the Robello breach of Personal Confidential Information of Plaintiffs and the Class.

134.    It is believed and therefore averred that "the legitimate needs of law enforcement" did not prevent Countrywide from providing expedient notice to the Class.  Specifically, it is believed and therefore averred that a law enforcement agency did not "determine[] that the notification will impede a criminal or civil investigation" and did not make "a request that the notification be delayed" until September 6, 2008.

135.    It is believed, and therefore averred, that Countrywide failed to, "in advance of the disclosure to the customer, report the breach of security and any information pertaining to the breach to the Division of State Police in the Department of Law and Public Safety for investigation or handling."

136.    Because the breach of Personal Confidential Information in this case involved more than 1,000 persons, Countrywide was required to, but failed to, "also notify, without unreasonable delay, all consumer reporting agencies that compile or maintain files on consumers on a nationwide basis, as defined by subsection (p) of section 603 of the federal "Fair Credit Reporting Act" (15 U.S.C. s. 1681a), of the timing, distribution and content of the notices."

137.    New Jersey law also provides as follows:

"A business … shall destroy, or arrange for the destruction of, a customer's records within its custody or control containing personal information, which is no longer to be retained by the business or public entity, by shredding, erasing, or otherwise modifying the personal information in those records to make it unreadable, undecipherable or nonreconstructable through generally available means."

N.J.S.A. 56:8-162.

138.    Countrywide was no longer required to retain the Personal Confidential Information of Class members, including Sub-Class members, after the application process was complete.  By failing to destroy such information prior to the breach by Robello, Countrywide violated New Jersey law.

139.    Because New Jersey provides that violations of the foregoing statutes constitute an unlawful practices within the meaning of the New Jersey consumer fraud law, the foregoing acts and failures to act by Defendants constitute per se violations of New Jersey law.

140.    Defendants acted willfully, knowingly and/or recklessly with respect to its acts and omissions above.

## COUNT VI
## CONSPIRACY

141.    Plaintiffs and the Class hereby incorporate by reference thereto the averments of paragraphs 1 through 140 hereof as if fully set forth here and further allege as follows.

142.    As set forth more fully above, beginning at least as early as July 2006, the exact date being unknown to Plaintiffs and the Class, and continuing thereafter until at least August 2008 when Defendants Rebollo and Siddiqi were captured and criminally prosecuted, Defendants and their co-conspirators entered into an agreement and/or otherwise engaged in a continuing conspiracy to defraud the Plaintiffs and the Class by causing Personal Confidential Information  of Plaintiffs and the Class to be unlawfully accessed, downloaded and sold.

143.    Pursuant to the widespread conspiracy alleged herein and in furtherance thereof, Defendants and their co-conspirators engaged in a wide range of activities, the purpose and effect of which was to defraud the Plaintiffs and the Class and to act or take substantial steps in furtherance of the conspiracy.  Those activities include the following:

       (a)    Defendants discussed and agreed among themselves and with their co-conspirators that they would arrange for and accomplish the unauthorized access to and copying of the Personal Confidential Information of Plaintiffs and the Class;

       (b)    Defendants discussed and agreed among themselves and with their co-conspirators that they would arrange for and accomplished the sale of Personal Confidential Information  of Plaintiffs and the Class; and

       (c)    Defendants discussed and agreed among themselves and with their co-conspirators that they would work together to conceal their scheme from Plaintiffs and the Class and withhold material information from Plaintiffs and the Class about the scheme.

144.    Defendants performed these acts alleged herein in furtherance of the common plan or design for the conspiracy with knowledge of the injury and damage it would cause to Plaintiffs and the Class and with intent to cause such injuries or with reckless disregard for the consequences.

145.    As a direct and proximate result of Defendants= conspiracy as alleged herein, Plaintiffs and the Class have been injured and damaged, and Defendants are jointly and severally liable for such injuries and damages.

WHEREFORE, Plaintiffs, on behalf of themselves and the members of the Class, respectfully seek the relief set forth below.

<u>**COUNT VII**</u>
<u>**VIOLATIONS OF THE CONSUMER FRAUD LAWS**</u>

146.     Plaintiffs and the Class hereby incorporate by reference thereto the averments of paragraphs 1 through 145 hereof as if fully set forth here and further allege as follows.

147.     Plaintiffs and members of the Class are actual and potential consumers who provided Defendants with their Personal Confidential Information under the express representation that the same would not illegally be accessed, downloaded, saved, distributed, transferred and sold to various individuals and entities not yet fully known.  New Jersey and other States have enacted laws to protect consumers against unfair, deceptive or fraudulent business practices, unfair competition and false advertising and unconscionable business practices.  New Jersey and other States allow consumers a private right of action under such laws.

148.     By the misrepresentations and non-disclosure of material facts alleged above, the Defendants deceived and continue to deceive consumers, such as Plaintiffs and the Class.  This conduct constitutes unconscionable, unlawful, unfair, deceptive and/or fraudulent business practices within the meaning of the New Jersey Consumer Fraud Act, 56:8-1, *et seq* and the laws of other States as follows:

  a.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ariz. Rev. Stat. § 44-1522, *et seq.*;

  b.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ark. Code § 4-88-101, *et seq.*;

  c.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Cal. Bus. & Prof. Code §§ 17200, *et seq.*, 1770;

  d.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Colo. Rev. Stat. § 6-1-105, *et seq.*;

  e.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Conn. Gen. Stat. § 42-110b, *et seq.*;

43

f.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 6 Del. Code § 2511, *et seq.*;

g.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of D.C. Code § 28-3901, *et seq.*;

h.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. § 501.201, *et seq.*;

i.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Haw. Rev. Stat. § 480, *et seq.*;

j.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Idaho Code § 48-601, *et seq.*;

k.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 ILCS § 505/1, *et seq.*;

l.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ind. Code Ann. § 24-5-0.5.1, *et seq.*;

m.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Kan. Stat. § 50-623, *et seq.*;

n.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Md. Com. Law Code § 13-101, *et seq.*;

o.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mass. Gen. L. Ch. 93A, *et seq.*;

p.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mich. Stat. § 445.901, *et seq.*;

q.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 325F.67, *et seq.*;

r.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Vernon's Mo. Rev. Stat. § 407.010, *et seq.*;

s.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601, *et seq.*;

t.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nev. Rev. Stat. § 598.0903, *et seq.*;

u.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358-A:1, *et seq.*;

v.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.J. Stat. Ann. § 56:8-1, *et seq.*;

w.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. Stat. Ann. § 57-12-1, *et seq.*;

x.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*;

y.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. Gen. Stat. § 75-1.1, *et seq.*;

z.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.D. Cent. Code § 51-15-01, *et seq.*;

aa.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ohio Rev. Stat. § 1345.01, *et seq.*;

bb.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices or made representations in violation of Okla. Stat. tit. 15 § 751, *et seq.*;

cc.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Or. Rev. Stat. § 646.605, *et seq.*;

dd.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 73 Pa. Stat. § 201-1, *et seq.*;

ee.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of R.I. Gen. Laws. § 6-13.1-1, *et seq.*;

ff.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Laws § 39-5-10, *et seq.*;

gg.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Code Laws § 37-24-1, *et seq.*;

hh.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tenn. Code § 47-18-101, *et seq.*;

ii.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tex. Bus. & Com. Code § 17.41, *et seq.*;

jj.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Utah Code Ann. § 13-1 1-1, *et seq.*;

kk.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Vt. Stat. Ann. tit. 9, § 245 1, *et seq.*;

ll.     Defendants have engaged in unfair competition or unfair, deceptive acts or fraudulent acts or practices in violation of Wash. Rev. Code § 19.86.010, *et seq.*;

mm.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of W. Va. Code § 46A-6-101, *et seq.*;

nn.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wis. Stat. § 100.18, *et seq.*; and

oo.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wyo. Stat. § 40-12-100, *et seq.*

149.    As a direct and proximate result of the Defendants= unfair and deceptive trade practices throughout the above states and the District of Columbia and Puerto Rico, including New Jersey, Plaintiffs and the Class have and will continue to suffer damages in an amount to be determined at trial.

## COUNT VIII
## INTENTIONAL VIOLATION OF THE FAIR CREDIT REPORTING ACT

150.     Plaintiff and the Class hereby incorporate by reference thereto the averments of paragraphs 1 through149 hereof as if fully set forth here and further allege as follows.

151.     The Fair Credit Reporting Act ("FCRA") was created to "require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit… and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information." 15 U.S.C. § 1681(b).

152.     The FCRA imposes the following duty: "Every consumer reporting agency shall maintain reasonable procedures designed to… limit the furnishing of consumer reports to the purposes listed under section 604 [15 U.S.C. § 1681(b)]." 15 U.S.C. § 1681e(a).  Section 604, 15 U.S.C. § 1681(b), sets forth various permissible purposes for the furnishing of consumer reports. Defendants' disclosure of consumer information  (*i.e.* Personal Confidential Information) to

unauthorized third parties did not comply with any of the permissible purposes set forth in 15 U.S.C. § 1681(b).

153.     The FCRA defines "consumer reporting agency" as follows:

The term 'consumer reporting agency' means any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of ***assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties,*** and which uses any means

or facility of interstate commerce for the purpose of preparing or furnishing consumer reports.

15 U.S.C. § 1681(b) (emphasis added).

154.     The FCRA defines "consumer report" as follows:

47

The term 'consumer report' means any written, oral, or other communication of any information by a consumer reporting agency ***bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living*** which is used or expected to be used or collected in whole or in part for the purpose of serving as a ***factor in establishing the consumer's eligibility for***

> (A) ***Credit*** or insurance to be used primarily for personal, family, or household purposes;

> (B) employment purposes; or

> (C) any other purpose authorized under section 604 [15 U.S.C. § 1681(b)].

15 U.S.C. § 1681a(d)(1) (emphasis added).

155.   Plaintiffs and the Class members are "consumers" or "persons" as defined and construed under FCRA (15 U.S.C. § 1681a(b) & (c)).

156.   Defendants are consumer reporting agencies under the FCRA, as they, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engage (and/or have regularly engaged in the past) in whole or in part in the practice of assembling or evaluating consumer credit information

or other information on consumers for the purpose of furnishing consumer reports to third parties, and use interstate commerce for the purpose of preparing or furnishing consumer reports.

157.   Specifically, the Countrywide Defendants are a "consumer reporting agencies" under the FCRA, as indicated on Countrywide's website.  On the page titled "privacy and security in the countrywide family" on Countrywide's website, Countrywide states:

> To fund and service your loan, comply with government regulations, improve our products and services, and better understand your financial needs, we collect and maintain customer and former customer data.  We collect information:
>
> - You provide us on applications and other forms (such as your phone, Social Security and account numbers, assets, income and employment history);
>
> - About your transactions with us (such as your loan balance, payment history and other account information);

- About your credit history from a credit reporting agency;

- About you or your property from business partners and service providers (such as a property appraisal, purchase contract or membership number);

- About you or your property from business partners and service providers (such as a property appraisal, purchase contract or membership number), or from current or past employers or other financial institutions when verifying information you provide on an application or other form; and

- About you from consumer purchasing and census data providers to develop competitive marketing programs for our customers.

We disclose some of this data to third parties (such as credit reporting agencies, regulators and loan investors). We may share some of this information with companies performing services on our behalf (such as the vendor who prepares our monthly statements). These service providers agree to keep the information confidential and not use it for any other purpose."

* * *

To offer and recommend valuable products and services, we may share customer and former customer information within our family of companies and the other Bank of America companies. The other Bank of America companies include financial service providers, such as a brokerage company and a credit card company, and nonfinancial companies such as operations and servicing subsidiaries.

*See* "privacy and security in the countrywide family" available at

http://my.countrywide.com/privacy.aspx.  (Attached hereto as Exhibit "A").

158.    As consumer reporting agencies, Defendants are required to maintain reasonable procedures designed to limit the furnishing of consumer reports to the permissible purposes outlined under FCRA.  *See* 15 U.S.C. § 1681e.

159.    Defendants' failed to maintain such reasonable procedures designed to limit the furnishing of consumer reports to the permissible purposes outlined under FCRA by negligently, willfully and/or recklessly failing to properly: (i) supervise their employees; (ii) monitor for unauthorized access to or use of consumer information; and/or (iii) adopt procedures to prevent or detect unauthorized access to or disclosure of consumer information.

160.    The FCRA states the following with respect to damages:

(a) Any person who willfully fails to comply with any requirement imposed under this title with respect to any consumer is liable to that consumer in an amount equal to the sum of

(1)(A) any actual damages sustained by the consumer as a result of the failure or damages of not less than $100 and not more than $1,000 …

(B) Such amount of punitive damages as the Court may allow; and

(C) in the case of any successful action to enforce any liability under this section, the costs of the action together with reasonable attorney's fees as determined by the court.

15 U.S.C. § 1681n(a).

161.    Plaintiffs and the Class have been damaged by Defendants' actions and failures to act. As a result, Plaintiffs and the Class are entitled to actual damages sustained or statutory damages of

not less than $100 and not more than $1,000, as well as punitive damages, litigation costs, and attorney's fees.

## COUNT IX
## NEGLIGENT VIOLATION OF THE FAIR CREDIT REPORTING ACT

162.    Plaintiffs and the Class hereby incorporate by reference thereto the averments of paragraphs 1 through 161 hereof as if fully set forth here and further allege as follows.

163.    Defendants engaged in at least negligent, if not willful or reckless, conduct in violating FCRA.

164.    In negligent disregard for the rights of Class members, Defendants failed to maintain reasonable procedures designed to limit the furnishing of consumer reports to the permissible purposes outlined in the FCRA by failing to properly: (i) supervise their employees; (ii) monitor for

50

unauthorized access to or use of consumer information; and/or (iii) adopt procedures to prevent or detect unauthorized access to or disclosure of consumer information.

165.    Defendants and their employees obtained Class members' Private Confidential Information, and sold or disseminated it to unauthorized third parties for no permissible purpose under the FCRA.

166.    The Countrywide Defendants are responsible for the employees' actions as their agents and employees, acting within the scope of their employment.

167.    Defendants' negligent conduct allowed their employees to obtain Plaintiffs' and Class members' consumer reports and Personal Confidential Information and sell it to third parties without the consent of Plaintiffs or Class members, and for no permissible purpose under FCRA.

168.    The FCRA states the following with respect to damages:

> (a) Any person who willfully fails to comply with any requirement imposed under this title with respect to any consumer is liable to that consumer in an amount equal to the sum of
>
>> (1)(A) any actual damages sustained by the consumer as a result of the failure or damages of not less than $100 and not more than $1,000
>> …
>>
>> (B) Such amount of punitive damages as the Court may allow; and
>>
>> (C) in the case of any successful action to enforce any liability under this section, the costs of the action together with reasonable attorney's fees as determined by the court.

15 U.S.C. § 1681n(a).

169.    Plaintiffs and the Class have been damaged by Defendants' actions.  As a result, Plaintiffs and the Class are entitled to actual damages sustained, as well as litigation costs and attorney's fees.

WHEREFORE, Plaintiffs, on behalf of themselves and the members of the Class, respectfully seek the relief set forth below.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and the Class request the Court to enter the following relief:

a.      Certify this case as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, and denominate Plaintiffs as representatives for the Class and their undersigned counsel as counsel for the Class;

b.      Declare unlawful the acts and practices alleged herein, and enjoin the Defendants from committing the acts complained of herein;

c.      Enter judgment against all Defendants for the violations alleged herein;

d.      Award the actual damages incurred by Plaintiffs and the members of the Class as a result of the wrongful acts complained of, along with pre-judgment and post-judgment interest at the maximum rate allowed by law;

e.      Award statutory damages set forth herein;

f.      Award of treble damages or multiple damages by operation of law;

g.      Award punitive damages;

h.      Award Plaintiffs the costs of this action, including reasonable attorney=s fees, and, where applicable, expert fees; and

i.      Award such other and further relief as the Court may deem just and appropriate.

## JURY DEMAND

Plaintiffs and the Class demand a trial by jury of all issues so triable in this cause.

Respectfully submitted,


Dated: December 17, 2008

s/Stacey A. Blankenship
Stacey A. Blankenship
Douglas R. Moore
**DENTON & KEULER**
555 Jefferson Street
Suite 301
Paducah, KY 42001

Donald E. Haviland, Jr., Esquire
Michael J. Lorusso, Esquire
**THE HAVILAND LAW FIRM**
111 South Independence Mall East,
Suite 1000
Philadelphia, PA 19106
(215) 609-4661 telephone

Barry Eichen, Esquire
**EICHEN LEVINSON CRUTCHLOW,
LLP**
40 Ethel Road
Edison, New Jersey 08817
(732) 777-0100 telephone
(732) 248-8273 facsimile

Kent M. Williams, Esquire
**LAW OFFICES OF KENT M. WILLIAMS**
1632 Homestead Trail
Long Lake, MN 55356
(763) 473-1383 telephone
(763) 473-0314 facsimile

**ATTORNEYS FOR PLAINTIFFS, MATTHEW
AND DANIELLE HOLMES, AND THE CLASS**