Stacey A. Blankenship, Esquire
Doug Moore, Esquire
**DENTON & KEULER**
555 Jefferson Street
Suite 301
Paducah, KY 42001
(270) 443-8253 telephone

*Counsel for Plaintiffs*
*Additional Counsel Appear on Signature Page*

## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF KENTUCKY

| | |
|---|---|
| MATTHEW AND DANIELLE HOLMES, JOHN AND TERRA STIERS<br><br>v.<br><br>COUNTRYWIDE FINANCIAL CORP., et. al. | Civil Action No. 5:08 CV 205-TBR<br><br>**SECOND AMENDED COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

## **TABLE OF CONTENTS**

Nature of the Case ..................................................................................................... 1

Summary of Claims ................................................................................................... 1

Jurisdiction and Venue .............................................................................................. 4

The Parties ................................................................................................................ 6

      Plaintiffs ......................................................................................................... 6

      Defendants ..................................................................................................... 8

Factual Background ................................................................................................. 11

Countrywide's Privacy Policy ................................................................................. 13

Details of the Fraudulent Scheme and Conspiracy to Breach
the Personal Confidential Information of Plaintiffs ................................................. 15

Defendants, Rene L. Rebollo and Sub-Prime Mortgage Lender,
Full Spectrum Lending ............................................................................................ 23

Defendant Wahid Siddiqi ........................................................................................ 31

Prior Breaches of Personal Confidential Information at Countrywide .................... 32

Defendants' Fraudulent Scheme and Conspiracy and Concealment
of the Same ............................................................................................................. 33

Count I Unjust Enrichment ...................................................................................... 36

Count II Fraud ......................................................................................................... 37

Count III Breach of Contract ................................................................................... 39

Count IV Breach of Covenant of Good Faith and Fair Dealing ............................. 40

Count V Breach of State Security Notification Laws .............................................. 41

Count VI Conspiracy ............................................................................................... 44

Count VII Violations of the New Jersey and Kentucky Consumer Fraud Laws ..... 45

Count VIII Intentional Violation of the Fair Credit Reporting Act ...............................................46

Count IX Negligent Violation of the Fair Credit Reporting Act ....................................................50

Prayer for Relief............................................................................................................................51

Jury Demand ................................................................................................................................51

Matthew and Danielle Holmes, and John and Terra Stiers, (collectively "Plaintiffs"), on their own behalf by and through their attorneys, allege as follows:

## NATURE OF THE CASE

1.     This case is brought by Plaintiffs who have had their personal identifying and financial information accessed without their authorization and sold as a result of the negligence, unfair and deceptive acts and practices and unconscionable business practices of the Defendants, and who have opted out of the class action settlement in the *In re Countrywide Financial Corp. Customer Data Security Breach Litigation,* MDL-1430, that was pending in this District, therefore maintaining their right to bring this private action.   The case seeks to remedy the harmful effects of the breach of their privacy interests, failure to timely and reasonably notify them of the breach in accordance with the law, and the misleading and deceptive notification and purported remedy ultimately provided by Defendants.

## SUMMARY OF CLAIMS

2.     During the period from at least July 2006 through the present (hereinafter the "relevant time period"), the exact dates of which are unknown by the Plaintiffs, all Defendants caused personal identifying and financial information about Plaintiffs  to be accessed, collected, downloaded, saved, distributed, transferred and sold to various individuals and entities without their knowledge or consent.  The corporate Defendants then failed to timely and reasonably notify Plaintiffs  of such unauthorized access and breach of their privacy interests, which notice is explicitly required by the laws of New Jersey.   And, the notice that was finally sent months later was materially false and misleading as to the nature and scope of the breach (that was fully known by Defendants

1

at the time) and appeared to be directed at promoting a sub-standard credit monitoring service (owned in part by certain corporate Defendants) in exchange for a wholesale waiver of the existing rights of Plaintiffs .

3.      The personal identifying and financial information consisted of at least the following:

a.      the names of Countrywide present and former customers, (including surnames, aliases, pre-and post-marital names, and the names of relatives and friends),

b.      their addresses (including email addresses),

c.      their phone numbers (including unlisted phone numbers),

d.      their Social Security numbers,

e.      their financial account information (including banking, credit card, loans and other financial account numbers),

f.      their income information,

g.      their monthly debt,

h.      their employment information,

i.      their credit scores, and

j.      their interest rates, loan amounts and balances on existing credit loans with Countrywide and other Lenders.

The above information is hereinafter collectively referred to as "Personal Confidential Information".

4.      Defendants Countrywide Financial Corporation, Countrywide Bank, FSB, Countrywide Home Loans, Inc., Full Spectrum Lending Division, and Bank of America

Corporation (collectively "Countrywide"), are in the business of selling credit financial services, including mortgage financing.

5.     Throughout the relevant time period, an employee of Countrywide by the name of Rene L. Rebollo Jr. ("Rebollo") systematically downloaded the Personal Confidential Information of Plaintiffs , and unlawfully marketed and sold the same to Defendant, Wahid Siddiqi, and others not yet fully known to Plaintiffs (but who are named herein as "Doe" Defendants, *i.e.* Doe's 1-50, ABC Corporations 1-50 and XYZ Partnerships and Associations 1-50).

6.     The unfair and deceptive practices relate to, *inter alia*, the following:

a.     Misrepresenting that Personal Confidential Information would be kept secure;

b.     Failing to take reasonable and necessary precautions, in accordance with the law, to secure Personal Confidential Information, especially after there had been a prior breach by a Countrywide employee in 2005;

c.     Failing to timely and reasonably notify Plaintiffs  of the breach and sale of the Personal Confidential Information after it was discovered;

d.     Misrepresenting the nature and extent of the breach of Personal Confidential Information in the Letter notifying the Plaintiffs of the breach;

e.     Misleading the Plaintiffs as to the nature of the credit monitoring service being provided;

f.     Omitting material information from the letter notifying the Plaintiffs of the breach; and

g.     Failing to take reasonable and necessary steps to prevent the future use and sale of Personal Confidential Information of Plaintiffs  by the Doe Defendants.

7.      As a direct and proximate result of the above-described acts and omissions of Defendants, Plaintiffs have suffered injury, damages and ascertainable losses detailed herein by having their Personal Confidential Information sold to Defendant Siddiqi and the Doe Defendants for future unauthorized commercial use of such information.

8.      On behalf of the Plaintiffs , this action seeks to have this Court declare such acts and omissions unlawful, to enjoin such acts and omissions from continuing to harm Plaintiffs to ascertain the identities of the Doe Defendants forthwith so that they may be enjoined from the further use and sale of Personal Confidential Information, to enjoin Countrywide from seeking to further compromise the rights of Plaintiffs by soliciting waivers of such rights through misleading offers of "free" credit protection, and to remedy the effects of the harm through appropriate equitable relief and an award of damages, including restitution, disgorgement, statutory and punitive damages.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because the claims herein arise under the laws of the United States of America. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 (diversity) in that the state of citizenship of each Plaintiff is different from the state of citizenship of the Defendants, and the amount of controversy exceeds $75,000.00, exclusive of interest and costs.

10.      This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the Plaintiff's allegations of violations of the state consumer protection laws of the State of New Jersey and Kentucky, as well as claims of common law fraud, breach of contract, breach of covenant of good faith and fair dealing, breach of the New Jersey

State Security Notification laws, civil conspiracy/concert of action, and unjust enrichment.

11.     This Court has personal jurisdiction over the parties because the Countrywide Defendants conduct substantial business in this State, have had systematic and continuous contacts within this State, and have agents and representatives that can be found in this State.

12.     The Court has jurisdiction over the individual Defendants because they have had sufficient minimum contacts with and/or have purposefully availed themselves of the laws and markets of the State of Kentucky through, among other things, their conspiratorial communications between themselves and with others (including telephonic and electronic communications) and their receipt, marketing, sale and distribution of the Personal Confidential Information of Kentucky residents.

13.     Under 28 U.S.C. § 1391, venue is proper in this District because Defendants engaged in substantial conduct relevant to the claims Plaintiffs, and caused harm to Plaintiffs.

## THE PARTIES

### Plaintiffs

14.     Plaintiffs, Matthew and Danielle Holmes, are husband and wife, residing at 30 Mount Holly Avenue, Mount Holly, New Jersey 08060.  As discussed more thoroughly below, the Holmes' had their Personal Confidential Information accessed and sold without authorization by Defendants.  As discussed more thoroughly below, although they both provided the relevant Personal Confidential Information to their original lender, which was later transferred to Countrywide, only Mr. Holmes received a letter from Countrywide informing him that they believed that his Personal Confidential Information had been accessed and sold without authorization.  The letter was not addressed to Mrs. Holmes, nor did she receive a separate letter.  Following the security breach, it is believed and therefore alleged, that someone who had obtained the Holmes' Personal Confidential Information as a result of the subject data security breach, and as a direct and proximate result of Defendants' conduct, attempted to open a line of credit with Beneficial Auto Finance.  Shortly after discovering that their Personal Confidential Information had been targeted, stolen and sold to unnamed third parties, the Holmes enrolled in a Credit Monitoring and Protection Service provided by True Credit, a subsidiary of TransUnion.  Since the subject data breach, the Holmes' have paid hundreds of dollars for the safety of the Credit Monitoring and Protection Services at a monthly rate of $14.95.  It is therefore believed and alleged that Mr. and Mrs. Holmes suffered injury, as more fully described below, as a direct and proximate result of the subject data security breach and Defendants conduct.

6

15.     Plaintiffs John and Terra Stiers, are husband and wife, currently residing at 434 Manning Street, Newark, OH 43055.  In December 2006, the Stiers purchased a home located at 2122 Mercer Dr., Richmond, KY 40475 with a mortgage obtained from "My Mortgage Pro", a company formerly located on New Circle Road in Lexington, KY. Shortly after acquiring the mortgage the Stiers were notified that the mortgage had been transferred to Countrywide.  As discussed more thoroughly below, the Stiers' had their Personal Confidential Information accessed and sold without authorization by Defendants.  Mr. and Mrs. Stiers received a letter from Countrywide informing them that they believed that their Personal Confidential Information had been accessed and sold without authorization.  As a direct result of the fact that the Stiers Personal Confidential Information had been targeted, accessed without their authorization and sold to unknown third parties, the Stiers began to get bombarded with various solicitations via telephone and U.S. mail.   The calls persisted at all hours of the day and night.  The solicitations included, but were not limited to, calls from collection agencies, universities and other secondary education institutions, and companies inquiring about the Stiers' interest in various home refinancing options.  Prior to the subject data breach the Stiers did not experience the harassing phone calls.  Although the Stiers had been loyal customers of Sprint for the fourteen (14) years prior to the subject data breach, as a result of the fact that their Personal Confidential Information had been sold to various unknown entities and the subsequent deluge of solicitation calls to their personal phone number, the Stiers cancelled their service with Sprint.  The Stiers were charged between $250 and $300 for cancelling their Sprint service.  Aside from their problems with their phone service, the Stiers spent countless hours researching this case and the hazards of identity theft that

7

resulting from the theft of such Personal Confidential Information.   It is therefore believed and alleged that Mr. and Mrs. Stiers suffered injury, as more fully described below, as a direct and proximate result of the subject data security breach and Defendants conduct.

16.     The Holmes and Stiers applied for and received mortgage and/or other credit loans that were subsequently acquired by Countrywide.  As part of the credit loan application process, Plaintiffs were required to provide Personal Confidential Information to their original lender that provided their mortgage prior to Countrywide's acquisition of the same, pursuant to an agreement that the Personal Confidential Information would be adequately protected from unauthorized access by others.   Thereafter, Countrywide acquired their existing loan under the explicit assurance that their Personal Confidential Information would be adequately protected from unauthorized access.

17.     As discussed throughout this Complaint, Plaintiffs suffered direct injury and damages as a result of the breach of that agreement, the negligence of Defendants and the acts and omissions and unlawful conduct of all of the Defendants set forth herein.

**<u>Defendants</u>**

18.     Defendant, Countrywide Financial Corporation ("Countrywide Financial"), is a Delaware corporation with its principal place of business located in Calabasas, California, and is a wholly-owned subsidiary of Bank of America corporation. Founded in 1969, Countrywide Financial is a diversified financial marketing and service holding company engaged primarily in residential mortgage banking and related business.

19.    Defendant, Countrywide Bank, FSB. ("Countrywide Bank") is a division of Countrywide Financial and is a Delaware corporation with its principal place of business located in Calabasas, California, and is a wholly owned subsidiary of Countrywide.

20.    Defendant, Countrywide Home Loans, Inc. ("Countrywide Home"), is a division of Countrywide Bank and is a Delaware corporation with its principal place of business located in Calabasas, California and is a wholly owned subsidiary of Countrywide Financial.

21.    Defendant, Full Spectrum Lending ("Full Spectrum"), is a division of Countrywide Bank and is a Delaware corporation with its principal place of business located in Calabasas, California and offices in Pasadena, California, and is a wholly owned subsidiary of Countrywide Financial.

22.    Defendant, Bank of America Corporation ("Bank of America"), is a Delaware corporation and has its principal place of business located in Charlotte, North Carolina.  Bank of America provides financial and banking services throughout the United States.

23.    Defendant Rene L. Rebollo, Jr. ("Rebollo") was at all times material hereto an employee of Countrywide and is an individual and resident of the State of California residing in Pasadena, California.  Upon information and belief, Defendant Rebollo was terminated by Countrywide only after he was arrested by prosecutive authorities.

24.    Defendant Wahid Siddiqi ("Siddiqi") is an individual and resident of the State of California, residing in Thousand Oaks, California.

25.     Defendants Doe's 1-50, ABC Corporations 1-50 and XYZ Partnerships and Associations (collectively "the Doe Defendants") are persons and entities who have received from Defendant Rebollo the Personal Confidential Information of Plaintiffs . The identities and locations of the Doe Defendants are not yet known, but are knowable by reason of the fact that the criminal complaints filed against Defendants Rebollo and Siddiqi detail multiple instances of unauthorized distribution and sale of the Personal Confidential Information of Plaintiffs.   For instance, the Affidavit of Special Agent Richard P. Ryan filed July 31, 2008, (attached hereto as Exhibit "G", ("Ryan Affidavit") cites as probable cause to believe a crime had been committed the fact that Rebollo "had provided various mortgage brokers and lead brokers Countrywide Home Loan data", which included the Personal Confidential Information of Plaintiffs .   These "various mortgage brokers and lead brokers", among others, are Doe Defendants herein.

26.     The foregoing Countrywide defendants, the individual defendants and the various "Doe" defendants, are collectively referred to herein as "Defendants."

27.     The acts alleged in this Complaint to have been done by each of the Defendants were authorized, ordered, done and/or ratified by their respective officers, directors, agents, employees or representatives while engaged in the management, direction, control or transaction of their respective business affairs.

28.     Various persons and/or firms, not named as Defendants herein, have participated as co-conspirators in the violations alleged herein and have performed acts and made statements or omissions in furtherance thereof.   Those known to exist and reasonably identifiable are named herein as "Doe" Defendants.

### Factual Background

42.     Defendant Countrywide is a diversified financial marketing and service holding company engaged in real estate finance-related businesses, including mortgage banking, banking   and mortgage warehouse lending, securities and insurance underwriting.

43.     On July 1, 2008, Countrywide Financial merged with Bank of America and has continued operating under the name Countrywide Financial Corporation.

44.     Countrywide can obtain customers by purchasing already established mortgages from other companies.  In addition, customers can open an account with Countrywide either by calling the toll-free Countrywide customer service line, filling out a preliminary application online, or visiting and completing account application forms at one of many Countrywide store locations located nationwide, including in New Jersey and Kentucky.

45.     Depending on the amount and type of loan being sought, a potential customer seeking to open an account with Countrywide may be required to provide his or her Personal Confidential Information, including, but not limited to, their name, date of birth, Social Security number, current contact information, banking information, (including bank account numbers, and the amounts contained in each personal bank account), credit history, (including prior loans, credit card debt, and a certified credit history report), employment information, (including paycheck stubs), and other relevant personal and financial information.

46.     Once the application is completed and all required supporting documents are submitted, Countrywide may take between two business days to several weeks to

approve or deny the application.  Once the application is approved, and an account is set up, the Countrywide customer typically receives monthly statements for payments in the mail.  Countrywide also sends to its customers a statement as to its policy of protecting Personal Confidential Information.  A Countrywide customer also may set up an online account to automatically receive and pay statements online through the use of the customer's credit card.  If an application is denied, Countrywide maintains the Personal Confidential Information of those applicants.

47.   According to the Countrywide Defendants, they "collect and maintain customer and former customer data." *See* "privacy and security in the Countrywide family" available at http://my.Countrywide.com/privacy.aspx.  (last visited November 14, 2008) (Attached hereto as Exhibit "A" hereto).  Defendants' Privacy Policy explicitly states:

"We collect information:

- You provide us on applications and other forms (such as your phone, Social Security and account numbers, assets, income and employment history);

- About your transactions with us (such as your loan balance, payment history and other account information);

- About your credit history from a credit reporting agency;

- About you or your property from business partners and service providers (such as a property appraisal, purchase contract or membership number);

- About you or your property from business partners and service providers (such as a property appraisal, purchase contract or membership number), or from current or past employers or other financial institutions when verifying information you provide on an application or other form; and

- About you from consumer purchasing and census data providers to

12

develop competitive marketing programs for our customers.

We disclose some of this data to third parties (such as credit reporting agencies, regulators and loan investors). We may share some of this information with companies performing services on our behalf (such as the vendor who prepares our monthly statements). These service providers agree to keep the information confidential and not use it for any other purpose."

48.     Plaintiffs relied upon these statements of privacy and security to their detriment.

49.     Plaintiffs did not authorize the employees of the Countrywide Defendants, or any other Defendant named herein, to access their Personal Confidential Information for purposes of downloading, saving, marketing, selling, brokering, or otherwise disseminating and selling such information to unauthorized third parties, including Siddiqi and the Doe Defendants.

### Countrywide's Privacy Policy

50.     Defendants have represented to Plaintiffs that they understand the value of protecting Personal Confidential Information. The document attached hereto at Exhibit "B" was sent to Plaintiffs and was relied upon by them in providing their Personal Confidential Information.

51.     Defendants promised to "safeguard" their customers' data by:

- setting policies and procedures for carefully handling customer information;

- limiting employee access to sensitive information;

- protecting against unauthorized access to customer data using data encryption, authentication, and virus detection technology;

- requiring service providers who do business with Countrywide to comply with privacy laws;

- adding company security practices;

- monitoring Countrywide websites through recognized online privacy and security organizations such a Sybertrust Corporation; and

- conducting background checks on all employees and providing privacy training.

52. The Countrywide Defendants specifically state, on their "privacy and security in the Countrywide family" website, that the company "(1) protects the confidentiality of Social Security numbers, (2) prohibits unlawful disclosure of Social Security Numbers, and (3) limits access to Social Security Numbers."  Exhibit "A".

53. Further, the Countrywide Defendants recognize the significant problems and harms caused by identity theft, defined by Countrywide as "when someone takes and uses your personal information (such as your name, social security or credit card number) without your permission to commit fraud on other crimes."  Countrywide further explains that "[t]hese criminals take the identities of others to open new credit cards; obtain phone or utility accounts, loans, or employment; open bank accounts; and/or pass fraudulent checks."  *Id.*

54. Countrywide provides details as to the harm that is suffered by the victims of identity theft as follows:

> "Identity thieves can damage the credit reputations and lives of victims.  Studies have shown that victims spend an average of $808 and 205 hours resolving the identity theft.  Time and money is spent clearing credit reports, reporting the theft to lenders and merchants, and filing complaints with law enforcement and governmental agencies.  One of the menacing problems with identity theft is that it can happen more than once.  Once the initial incident is resolved, the thief may begin using the victim's identity again after waiting 6 months to a year and the cycle begins all over again."

*Id.*

55.     The Countrywide Defendants failed to follow their own standards for appropriate security measures, as outlined in the above-mentioned Countrywide privacy policy, and thereby breached their duty of care to, and agreement with, their customers. Among other things, the Countrywide Defendants failed to detect security breaches by one of their employees occurring over the course of two years and under circumstances that a reasonably prudent company would have detected.  This was the second such occurrence.  Once discovered, they failed to take appropriate steps to stop such breaches. Indeed, were it not for the independent effort of the Federal Bureau of Investigation, the breaches likely would be continuing today undetected by the Countrywide Defendants.

## DETAILS OF THE FRAUDULENT SCHEME AND CONSPIRACY TO BREACH THE  PERSONAL CONFIDENTIAL INFORMATION OF PLAINTIFFS

56.     On or about October 26, 2007, Plaintiffs, Mr. and Mrs. Holmes, refinanced their existing mortgage for their primary residence located at 30 Mount Holly Avenue in Mount Holly, New Jersey.  The refinancing, which was arranged through Mortgage Now, Inc., an Ohio-based corporation located at 750 West Resource Drive in Brooklyn Heights, Ohio, provided the Holmes with a 30-year mortgage.  The Holmes' offered up their residence as collateral against the refinancing agreement.  Further, by the terms of the agreement, they were obligated to make PMI (mortgage insurance) payments throughout the term of the refinancing, as further security against any loan default. Accordingly, there was no need for Countrywide to maintain the Personal Confidential Information of Plaintiffs after October 2007.

62.     As part of the Holmes' refinancing application process, Plaintiffs provided the mortgagor with their Personal Confidential Information, including their names, addresses, Social Security numbers, employment history, prior tax returns, and other

personal identifying and financial information.  This disclosure was made with both express and implicit assurances, upon which Plaintiffs relied, that  the Holmes' Personal Confidential Information would remain confidential and not be disseminated in any unauthorized manner.

63.     On or about November 19, 2007, as part of a "welcome package" from Countrywide Bank, the Holmes' received a <u>Notice of Assignment, Sale, or Transfer of Servicing Rights</u> (hereinafter "Notice of Assignment") stating that Mortgage Now, Inc., the broker who had negotiated and executed the Holmes' refinancing agreement, had transferred their home loan to Countrywide Bank.  See Notice of Assignment attached as Exhibit "C" hereto.  Therefore, per the Notice of Assignment, effective December 1, 2007, Mr. and Mrs. Holmes became Countrywide customers.

64.     The Notice of Assignment states: "to ease any concerns [the Holmes'] have about  this process[ , ] [p]lease note the terms and conditions of your home loan documents do not change in any way, other than terms directly related to the servicing of your home loan."    *Id.*    Further, included in the Countrywide-described "welcome package" was a pamphlet entitled "Your Privacy" (hereinafter "Privacy Pamphlet").  *See* Privacy Pamphlet attached as Exhibit "B" hereto.  The Privacy Pamphlet was meant to "explain[ ] how [Countrywide] protect[s] and use[s] [customer's] information in a safe, secure and responsible manner."  *Id.*

65.     The Privacy Pamphlet states, in relevant part:

YOUR PROTECTION IS OUR PRIORITY

We strive to safeguard your data.  We do this by:

- setting policies and procedures for carefully handling your information;

- limiting employee access to sensitive information;
- protecting against unauthorized access to customer data using data encryption, authentication, and virus detection technology;
- requiring service providers who do business with us to comply with privacy laws;
- adding company security practices; and
- conducting background checks on all employees and providing privacy training.

\*       \*       \*

HOW WE OBTAIN AND USE INFORMATION

To provide you with banking products and services, comply with government regulations, improve our products and services, and better understand your financial needs, we collect and maintain customer and former customer data.  We collect information:

- you provide us on applications and other forms (such as your name, Social Security Number, driver's license or other government identification numbers);
- you provide us in our communications with you (such as by telephone, fax, mail, e-mail and surveys);
- about your account activity and transactions with us, our affiliates, business partners or others we work with to provide you financial products or services (such as your account balance, transaction history and other account information);
- about your credit history from a credit reporting agency;
- about you from business partners and service providers (such as a property appraisal, purchase contract or membership number) or from current or past employers or other financial institutions when verifying information you provide on an application or other form; and
- about you from consumer purchasing and census data providers to develop competitive marketing programs for our customers.

We disclose some of this data to third parties (such as credit reporting agencies and regulators).  We may share some of this information with companies performing services on our behalf (such as the vendors who prepare monthly customer statements).  These service providers agree to keep the information confidential and not use it for any other purpose.

\*       \*       \*

PROTECTING YOUR IDENTITY

17

> Identity theft is one of the fastest growing crimes in America.  We understand the implications identity theft can have and take very specific steps to reduce the chance that identity thieves can damage the credit reputations of our customers.  See our website at www.countrywidebank.com and click "Privacy and Security" for more information on identity theft and how to protect yourself.

66.     Since 2007, the Holmes have relied on the representations concerning the specific steps Countrywide takes to reduce the chance that they could become victims of identity theft, and further have relied on Countrywide's assurance that the company "strive[d] to safeguard [their] data."  Since the Holmes' mortgage was transferred to Countrywide, effective December 1, 2007, they have dutifully submitted monthly payments directly to Countrywide Bank and have maintained their account with Countrywide.

67.     Plaintiffs did not authorize Defendant Rebollo to access their Personal Confidential Information over the course of two years for purpose of downloading, saving, marketing, selling, or otherwise disseminating such information to unauthorized third parties, including Sidiqqi and the Doe Defendants, for money.

68.     Throughout the relevant time period, Plaintiffs were not aware of the scheme and conspiracy set forth herein.

69.     Shortly after September 5, 2008, the Holmes' received a letter from Beneficial, care of HSBC Auto Finance, ("the Beneficial Letter") informing them that a purported "recent credit request for the financing of a motor vehicle" had been denied for a variety of reasons including, among other things, the "number of inquiries within last 3 months".  *See* Beneficial Letter at Exhibit "D" hereto.  The Beneficial Letter, which was addressed to both Mr. and Mrs. Holmes, further stated the decision to deny auto financing was based in whole or in part on information obtained in a credit report received from

TransUnion.

70.    Prior to their receipt of the Beneficial Letter, the Holmes' were unaware that someone had sought to obtain credit financing of an automobile in their names.

71.    Prior to receiving the September 5, 2008, Beneficial Letter, neither Mr. nor Mrs. Holmes had applied for a credit request for the financing of a motor vehicle from Beneficial, HSBC Auto Finance.

72.    Prior to their receipt of the Beneficial Letter, and for a period dating back to at least July 2006 [the date Rebollo is alleged to have begun his scheme to access and sell the Personal Confidential Information of Plaintiffs ], the Holmes' had received no notice of any credit inquiry involving them.

73.    On information and belief, based upon the fact that Plaintiffs made application for mortgage financing in 2007 and their loan was assigned to Countrywide in November 2007, it is alleged that Rebollo made unauthorized access to and downloaded the Personal Confidential Information belonging to the Holmes'.  Mr. Holmes' receipt of the Countrywide Letter confirms that at least his Personal Confidential Information was accessed by Rebollo without his authorization.

74.    On September 6, 2008, one day after the date of the Beneficial Letter, Plaintiff Matthew Holmes (but not his wife) received a letter from Countrywide ("the Countrywide Letter"), informing him that Countrywide purportedly "*recently* became aware that a Countrywide employee (now former) *may have sold* unauthorized personal information about [him] to a third party."  Exhibit "E" (emphasis supplied).  The Countrywide Letter further stated that "[b]ased on a joint investigation conducted by Countrywide and law enforcement authorities, it was determined that the customer

information involved in this incident included your name, address, Social Security number, mortgage loan number, and various other loan and application information." The Countrywide Letter was not addressed to Mr. Holmes' wife, Danielle, nor did she receive a Countrywide Letter of her own.

75.     The Countrywide Letter confirms that "it was determined that the customer information involved in this incident included [Mr. Holmes'] name, address, Social Security number, mortgage loan number, and various other loan and application information."  *See* Exhibit "E" hereto. A "Consumer Privacy Alert" at Countrywide's website  http://my.Countrywide.com/media/securityalert.html explains that "various other loan and application information" could include "contact information – such as phone numbers and email addresses – and application and loan information – such as notified customer's income information, monthly debt, employment information, credit score, interest rate, and loan amount and balance."  *See* Exhibit "F" hereto.

76.     The foregoing statements were false and misleading insofar as Countrywide knew months before sending the Countrywide Letter that Personal Confidential Information had been accessed and sold without authorization.

77.     The Countrywide Letter, which was dated at least two (2) months after Countrywide reasonably became aware of the breach of the Personal Confidential Information of Plaintiffs  by Rebollo, stated that Countrywide "deeply regret[s] this incident and apologize[s] for any inconvenience or concern it may cause you."  After affirming its "responsibility to safeguard" the Personal Confidential Information of Countrywide customers, the Countrywide Letter went on to state that Countrywide had "terminated the (responsible) individual's access to customer information" and then

vaguely reported that "he is no longer employed by Countrywide." The Countrywide Letter further stated that "Countrywide will continue to work with law enforcement authorities to pursue further actions as appropriate."

78. Lastly, the Countrywide Letter states that "[a]s an additional measure of protection, Countrywide has arranged for ***complimentary*** credit monitoring services provided by a Countrywide vendor ***at no cost to you*** over the next two years." The letter reiterates that the service is to be free by emphasizing that **"[y]ou will not be billed for this service."**

79. These statements are false and misleading as there is a substantial "cost" being paid by Plaintiffs in having to surrender substantial rights in order to obtain the "complimentary" credit monitoring service. The letter goes on to explain that Countrywide has engaged ConsumerInfo.com, Inc., an Experian® Company, to provide at [the victim's] option, a two-year membership in Triple Advantage Credit Monitoring…(which) includes daily monitoring of (the victim's) credit reports from all three national credit reporting companies (Experian, TransUnion and Equifax) and e-mail monitoring alerts of key changes to (the victim's) credit reports." The letter does not disclose the actual relationship between Countrywide and ConsumerInfo.com, nor does it properly advise the victim of the cost of the services offered, including the fact that substantial rights are surrendered by accepting the credit monitoring.

80. The Countrywide Letter makes no reference, explicitly or implicitly, to any action taken by Countrywide to assure that such breaches of Personal Confidential Information will not occur in the future, including, among other things, securing all Countrywide computers with the necessary software to prevent unauthorized access and

the unauthorized downloading of Countrywide customer profiles, monitoring individual employees' access and use of Countrywide computers containing customer's sensitive identification data, and/or purging such data at some reasonable time after it no longer becomes necessary for Countrywide to maintain it (assuming it is ever necessary.

81.     The Countrywide Letter also fails to convey to Countrywide customers who had their Personal Confidential Information accessed and sold by Rebollo precisely when and how Countrywide became aware of the breach.  Accordingly, the Countrywide letter misleads Countrywide  customers when it says the company "recently" learned of the breach, when in reality it knew of the breach months earlier.  Countrywide thus failed to reasonably inform Plaintiffs why the company chose to wait over two months after Countrywide actually became aware of the breach before notifying the affected Countrywide customers, which unexcused, substantial time lapse is believed and therefore alleged to have resulted in the unauthorized use of Private Confidential Information for commercial purposes by Siddiqi and the Doe Defendants.

82.     The Countrywide Letter makes no reference to the August 1, 2008 arrest of Rebollo, who was charged with exceeding authorized access to the Countrywide computers in connection with his fraudulent scheme and conspiracy with Siddiqi and the Doe Defendants to access the databases stored on Countrywide computers, to download Plaintiffs' Private Confidential Information and to sell the information to third parties like Siddiqi and the Doe Defendants.  Nor does the Countrywide Letter explain why, despite the fact that the FBI had arrested Rebollo – the "employee responsible for the breach" – along with at least one other known co-conspirator, Siddiqi, Countrywide chose to wait over five weeks after the arrests to notify the victims of the breach.

83.     Shortly after learning that their Personal Confidential Information had been targeted, accessed without their authorization, and sold to various third-parties, who had then used said information to attempt to obtain a car loan, as discussed above regarding the Beneficial Letter, the Holmes'  purchased independent credit monitoring and protection through True Credit, a subsidiary of TransUnion.  Having become aware that unknown persons had purchased their Personal Confidential Information from Mr. Rebollo, and likewise, now having reason to question the security of their Personal Confidential Information that was entrusted to Countrywide, the credit monitoring and protection had become reasonable and necessary.  Since the subject data breach, the Holmes' have paid hundreds of dollars for the safety of the Credit Monitoring and Protection Services, at a monthly rate of $14.95 per month.

84.     TrueCredit, now part of TransUnion, is a credit monitoring and protection service which offers unlimited access to all three credit reports and credit scores from the three credit bureaus (TransUnion, Experian, and Equifax), notification and e-mail updates within 24 hours of critical chances to all three reports, security freeze tool to lock and unlock your TransUnion credit report, unlimited toll-free access to identity theft specialists, and up to $25,000.00 identity theft insurance.   Given the Holmes' experience, and the fact that their Personal Confidential Information had been stolen and sold by Mr. Rebollo, and the same was later used to attempt to acquire a car loan from HSBC Auto Finance, see discussion above regarding the Beneficial Letter, the service and protection provided by TrueCredit was reasonable and necessary.

### Defendants, Rene L. Rebollo and Sub-Prime Mortgage Lender, Full Spectrum Lending

85.     Following an investigation conducted by the Federal Bureau of

Investigation ("FBI"), on August 1, 2008, Rene L. Rebollo Jr., of Pasadena, California, was arrested and charged with exceeding authorized access to the computer of a financial institution in connection with Rebollo's scheme to access the databases stored on Countrywide computers, to download customers' sensitive Personal Confidential Information and to sell that information to third parties. *See generally*, Affidavit of Richard Ryan dated July 31, 2008 at Exhibit "G" hereto.  (The facts of the Ryan Affidavit are incorporated herein by reference thereto.)

86.    At the time of his arrest, Rebollo was employed as a Senior Financial Analyst for Countrywide Home Loan's subprime mortgage division, Full Spectrum Lending, located in Pasadena, California.  He had been originally employed by the Countrywide Defendants from June 1993 to April 1994, and was hired again in September 1999.

87.    As described more fully below, Full Spectrum Lending has been the center of the subprime mortgage meltdown and crisis in this country.  The Countrywide subsidiary was sued by State Attorneys' General throughout the country for its unfair and deceptive practices, and Defendant Bank of America, the parent company of Countrywide, has agreed to settle the claims of the States for more than $4,000,000,000.00.

88.    Prior to his position in subprime lending with Full Spectrum Lending, Rebollo had been employed by Countrywide Home Loan's Simi Valley office in various positions for approximately nine and one-half years.  As a subprime Senior Financial Analyst, Rebollo was paid a salary of $63,000 annually with a small bonus of $2,000 for a total annual compensation of $65,000.

89.    In the scope of his employment, Rebollo was provided access by Countrywide to many Countrywide Home Loan databases, which contained sensitive information, such as Social Security numbers of Countrywide customers located in New Jersey, Kentucky, and throughout the United States including the District of Columbia and Puerto Rico.  Though most of the Countrywide Home Loan computers had a security feature which disabled the access and use of flash drives, there was at least one unsecured computer that did not have the software.  Rebollo, therefore, had access to at least one unsecured computer and used it to download and save the Countrywide Home Loan data to his thumb drive.

90.    Over the course of two years, Rebollo accessed Countrywide Home Loan databases and ran reports from the company's databases at his workspace.  Rebollo then downloaded the reports, containing Countrywide Home Loan data, including customer names, social security account numbers, telephone numbers, mortgage loan numbers, and other Countrywide Home Loan client records, onto personal "flash" drives, or "thumb" drives.  Typically, this was done on Sundays, when Rebollo was not required to be at work and did not receive any extra compensation for being at work.  However, each time, for approximately one hour, he would come to work, access the various Countrywide Home networks and databases, save the data to a thumb drive and then leave the premises.  On occasion, however, Rebollo would access and save the data during his regular hours.

91.    Although it apparently was against company policy to place thumb drives or external data storage devices into any Countrywide computers, and such policy apparently was intended to prevent the leak of Countrywide customer data – including

the Personal Confidential Information at issue in this case – it is believed and therefore averred that the Countrywide Defendants failed to take reasonable precautions to prevent, detect and stop (after it had begun) the systematic use of thumb drives by Rebollo off-hours over the span of two (2) years.

92.    On some occasions, Siddiqi and the Doe Defendants requested that Rebollo obtain specific types of Countrywide customer data.  For example, Rebollo was asked for "portfolio leads" or "new declines", meaning he was specifically asked to provide Personal Confidential Information of Countrywide's former customers.  Because of his widespread access, Rebollo was able to access these, and other specific databases to provide the information and data sought.  The result was a sophisticated crime wherein Rebollo was able to target specific individuals and demographics, obtain their Personal Confidential Information and sell the same to third parties for financial gain.  Plaintiffs complain that Countrywide should not be maintaining such Personal Confidential Information about its former customers, especially in a manner that puts it at risk of unauthorized access, as occurred in this case.  Further, Plaintiffs maintain that Countrywide was negligent in allowing such a sophisticated crime to be conducted within their company.

93.    Two databases that Rebollo accessed and saved Personal Confidential Information of Countrywide customers have been identified as those bearing the names "AS400" and "Accuate."  It is not clear how many other databases Rebollo accessed, although such information should be known by Countrywide.

94.    Rebollo personally estimated that he downloaded approximately 20,000 Countrywide Home Loan customer profiles every week for approximately two years.

Accordingly, over the course of two years, Rebollo purports to have downloaded over 2.8 million customer profiles.  The figure is likely higher because the FBI was able to arrange for the purchase of Personal Confidential Information of 38,000 Countrywide customers during a July 9, 2008 purchase from Siddiqi.

95.     Upon downloading and saving the Personal Confidential Information on his personal thumb drives, Rebollo then left Countrywide Home premises with the intent to sell the data.  He would then sell his weekly batch of approximately 20,000 Countrywide Home profiles for approximately $500.  Rebollo conducted each transaction either by selling the actual thumb drive consisting of the customer profiles to a third party or by e-mailing the contents of the thumb drive to the buyer.  In e-mailing the sensitive information, Rebollo used both his personal home computer as well as a public computer from a local Kinko's located at 855 East Colorado Blvd, in Pasadena, California.

96.     Rebollo opened a Washington Mutual account under the name "Rene Rebollo, Doing Business As: RR Consulting", specifically for the purpose of depositing and holding the proceeds of the Countrywide Home data sales.   He estimated that over the course of two years, he profited approximately $50,000 to $70,000 in total from the sales of the Countrywide Home data.

97.     The Countrywide Defendants knew or should have known the risks associated with failing to ensure that personnel were not able to install and/or use portable, external devices or "removable media" known as "flash" drives or "thumb" drives (hereafter "flash drives"), into their Countrywide computers with access to the Personal Confidential Information stored therein.  Likewise, the Countrywide Defendants knew or should have known, that if use of such flash drives was possible, personnel with

access to Personal Confidential Information stored on Countrywide's computers and/or networks would be able to copy said Personal Confidential Information from the Countrywide system, store the same on the flash drives described herein, and remove those flash drives from the Countrywide computer system containing the sensitive Personal Confidential Information.

98.    Countrywide knew or should have known that if appropriate measures were not taken to ensure that such access was not possible, Countrywide would be negligently exposing its customers to the risk of both unauthorized access and ultimately unauthorized transfer and sale of their Personal Confidential Information, since Countrywide would not be able to ensure the security of the same.

99.    Countrywide had a duty to protect Plaintiffs' Personal Confidential Information from unauthorized access and transfer and/or sale.  Countrywide knew, or should have known, that said duty required necessary security  measures to be taken to ensure that no personnel was able to access Plaintiffs' Personal Confidential Information, as well as all other confidential information, with the ability to store the same on the portable drives discussed in averment No. 97, above.

100.    It is apparent, and alleged herein, that the security systems in place at Countrywide were not adequate to protect Plaintiffs' Personal Confidential Information from unauthorized access, transfer, and sale.  Likewise, it is apparent, and specifically alleged herein, that any steps taken by Countrywide to ensure that personnel were not able to use flash drives as discussed above were not adequate nor effective to prevent breaches such as the subject Rebollo data breaches[1].  Therefore, Countrywide, aware of

---

[1] The scope and extent of Countrywide's overall security system and steps taken to protect Plaintiffs' Personal Confidential Information will be the subject of future

the risks associated with allowing removable devices to access their computers and failing to protect Plaintiffs from the same, were negligent in their security and protection of Plaintiffs' Personal Confidential Information.   Such negligence directly led to the Rebollo data breaches, which spanned several years, and ultimately the sale of Plaintiffs' Personal Confidential Information and the injury to Plaintiffs as alleged herein.

101.    Specifically, with respect to the Rebollo breaches, Countrywide knew or should have known in the exercise of reasonable diligence that Mr. Rebollo had access to many Countrywide Home Loan databases in the scope of his employment, many of which contained sensitive information such as social security account numbers of Countrywide Home Loan clients, and the Personal Confidential Information described herein.   Although most Countrywide Home Loan computers had a security feature which disabled the access and use of flash drives to avoid Countrywide Home Loan data leaks, one computer that Rebollo had access to did not contain the Countrywide Home Loan security features that disabled flash drive access.   Due to Countrywide's failure to ensure that the security feature described above was installed on all appropriate computers, Rebollo was able to run reports on Countrywide Home Loan databases from Countrywide Home Loan computers at his workspace and save the reports to personally owned flash drives, also known as thumb drives.

102.    Due to Countrywide's negligence, as described herein, Rebollo was able to access the Countrywide Home Loan databases, download the Countrywide Home Loan

---

discovery in this case.  Given the known facts regarding Mr. Rebollo's conduct, the specific security measures taken by Countrywide to prevent personnel from being able to plug portable flash drives into their workstations, copy information from the workstation and/or network onto said portable flash drive, and then leave Countrywide's offices with the ability to transfer and/or sell the information copied from the Countrywide system will be the focus of an otherwise broad subject of discovery into Countrywide's apparent security failures.

data, and save the data to his personally owned flash drives.  Countrywide knew or should have known that if personnel were able to access and store Countrywide data, as Rebollo was able to, then Countrywide's customers would be exposed to the possibility of having the Personal Confidential Information they entrused Countrywide to secure sold to unauthorized third parties.  As a direct and proximate result of Countrywide's failure to ensure that proper security measures were in place to prevent the conduct described herein - wherein Rebollo was able to use portable flash drives to store and later sell Plaintiffs' Personal Confidential Information - Plaintiffs had their Personal Confidential Information stolen and sold to various unknown third parties.  Accordingly, Countrywide breached its duty to protect Plaintiffs' from such unauthorized access and transfer.

103.    Upon information and belief, during an internal investigation regarding the overall adequacy of Countrywide's security, at least 75 to 80 persons of interest were identified by Countrywide for whom Countrywide believed, or had reason to believe, may have had some responsibility for either the Rebollo data breach or other data breaches or problems with Countrywide's security systems.  Several of those persons of interest were specifically thought by Countrywide to have been involved in the Rebollo data breach, including one person who admitted receipt of the Rebollo information and was terminated by Countrywide.

104.    Likewise, Countrywide and the FBI identified several other persons of interest, some of whom were account executives, like Mr. Rebollo, who were also engaged in activities that violated Countrywide's security policies and therefore exposed Plaintiffs and other customer's to the potential for unauthorized access and sale of their Personal Confidential Information.  In fact, recent history shows that the Countrywide

and Bank of America Defendants had experienced several data breaches prior to the subject Rebollo breach and therefore were on notice of their respective companies' security deficiencies.  It is believed and therefore alleged that the corporate defendants knew or should have known that their security systems and measures taken to prevent unauthorized access, transfer, and sale of customers' Personal Confidential Information were deficient, and that Countrywide failed to adequately fix said deficiencies, thus giving rise to the subject data breach.

105.    Likewise, there have been data breaches that have occurred since the Rebollo incident that call into question any changes that the company implemented after the widespread news of the subject breach.  It is believed and therefore alleged that due to the insufficient security at Countrywide, Plaintiffs' Personal Confidential Information continues to be at risk for exposure and future injury related thereto.

### Defendant Wahid Siddiqi

106.    Following the investigation conducted by the FBI, on August 1, 2008, Defendant, Wahid Siddiqi, was arrested and charged with fraud and related activity in connection with access devices.

107.    On July 7, 2008, an undisclosed confidential witness, working for the FBI, engaged in a series of telephone conversations with Siddiqi regarding the FBI's effort to purchase Personal Confidential Information of Countrywide customers.  During one of the calls, the confidential witness negotiated a price of $4,000 for the personal confidential customer profiles of approximately 38,000 Countrywide customers and a meeting was set for Wednesday, July 9, 2008 at 10:30 a.m. to purchase the data.   That day, the witness, equipped with an audio and video recording device and $4,000 provided

by the FBI, met Siddiqi at the predetermined meeting place.  There, Siddiqi sold the witness two compact disks containing several spreadsheets which included, among other things, several thousand Social Security numbers.  Upon reviewing the data, the witness gave Siddiqi the $4,000.  The audio recording device recorded Siddiqi telling the witness at the time of the transaction that the leads were "fresh from Countrywide" and "will have full socials."

108.    An FBI review of the disks sold by Siddiqi revealed that they contained several spreadsheets in Excel format.  Each spreadsheet contained a large quantity of names and subsequent columns of data including the customers' telephone numbers, names, Social Security account numbers and mortgage loan numbers, among other data. The FBI agent conducting the review estimated that the spreadsheets from this single transaction contained Personal Confidential Information for approximately 38,000 individuals.

109.    Copies of the spreadsheets purchased from Siddiqi on July 9, 2008, were then provided to Countrywide Home investigators for verification and authentication, who later confirmed that the data belonged to Countrywide.  It was further confirmed that the Social Security numbers associated with the names on the spreadsheets were the actual Social Security account numbers belonging to Countrywide Home account holders and the data corresponded to Countrywide Home records.

### Prior Breaches of Personal Confidential Information at Countrywide

110.    The above-described event is not the first time Countrywide was involved in a serious data breach of Personal Confidential Information. Two years ago, a website known as ConsumerAffairs.com investigated the case of Joan Carpenter from

32

Toms River, New Jersey, who received a Countrywide letter stating that an employee of Countrywide had "disclosed documents" relating to her mortgage.

111.    Ms. Carpenter was surprised to learn that the data breach impacted her because she had paid off her Countrywide loan prior to receiving the letter.

112.    Countrywide has refused to comment on the incident, which according to ConusmerAffairs.com, remains unresolved to this day.

113.    However, the significance of this prior data breach is that Countrywide became aware that its computers and data security measures were insufficient to adequately protect the Personal Confidential Information of Plaintiffs.

### DEFENDANTS' FRAUDULENT SCHEME AND CONSPIRACY AND CONCEALMENT OF THE SAME

114.    Defendants conspired and agreed to accomplish the fraudulent scheme set forth herein in order to profit from the sale of Personal Confidential Information of Plaintiffs, and they committed multiple acts in furtherance of this conspiracy which are outlined in this Complaint to fulfill this goal.

115.    Specifically, in furtherance of this scheme and conspiracy to defraud Plaintiffs, Defendants created a distribution network designed to unlawfully market and sell the Personal Confidential Information of Plaintiffs to individuals and entities who were not authorized to receive, review or utilize such information.  Beyond Defendant Siddiqi, the individuals and entities involved in the scheme are only broadly known to include "various mortgage brokers and lead brokers" as generally identified in the Ryan Affidavit.  Accordingly, these persons and entities are named herein as the Doe Defendants.

33

116.    Defendants implemented the scheme and conspiracy in the following manner:

i.    Arranging for and conducting the unauthorized access to Personal Confidential Information belonging to Plaintiffs from Countrywide network computers;

ii.    Arranging for and conducting the unauthorized downloading and saving on flash and thumb drives the Personal Confidential Information of Plaintiffs;

iii.   Marketing the sale to unauthorized persons and entities (i.e. the Doe Defendants) of Personal Confidential Information belonging to Plaintiffs;

iv.    Contacting and communicating with third parties through telephonic, electronic mail and in-person communications about the sale and purchase of Personal Confidential Information of Plaintiffs;

v.    Distributing Personal Confidential Information of Plaintiffs to Siddiqi and the Doe Defendants with knowledge that such distribution was unauthorized;

vi.    Exchanging money for the unauthorized sale of Personal Confidential Information belonging to Plaintiffs;

vii.   Receiving the proceeds and benefits of their fraudulent scheme and conspiracy, including at least $50,000-$70,000 received by Rebollo and approximately four times that amount by Siddiqi;

viii.  Working in concert to conceal their scheme and to circumvent efforts to detect their scheme by others, including those in law enforcement;

117.    Defendants concealed their fraudulent conduct from Plaintiffs by controlling the process and methodology by which they downloaded, stored, marketed, distributed and sold the Personal Confidential Information. Moreover, Defendants' fraudulent conduct was of such a nature as to be self-concealing. Further, the Countrywide defendants concealed the nature and extent of the scheme and conspiracy

after the details were fully learned, and they have yet to divulge all such details to Plaintiffs, including the names of the Doe Defendants.

118.    Plaintiffs  had no knowledge of the conspiracy, or other unlawful conduct alleged herein, or of any facts that might have led to the discovery thereof in the exercise of reasonable diligence.  Plaintiffs  could not have discovered the conspiracy, concerted action or other unlawful conduct alleged herein by the exercise of due diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of and to conceal their unlawful conduct and conspiracy.  These techniques of secrecy included, but were not limited to, secret meetings and communications, misstatements about the actions, omissions, and other conduct alleged herein.

119.    Plaintiffs were diligent in pursuing an investigation of the claims asserted in this Complaint once alerted to the potentiality of such claims by their receipt of the Countrywide Letter.  Through no fault of their own, they did not receive inquiry notice or learn of the factual basis for their claims in this Complaint or their injuries suffered therefrom until the earliest date of September 6, 2008, when the Countrywide Letter was sent to Plaintiffs.  *See* Exhibit "E"

120.    The Defendants' failure to properly disclose their unlawful conduct and conspiracy, and other acts and omissions as alleged herein until September 6, 2008, was and is willful, intentional, wanton, malicious, outrageous, and was undertaken in deliberate disregard of, or with reckless indifference to, the rights and interests of Plaintiffs  in protecting their Private Confidential Information.

121.    Because the unlawful conduct and conspiracy was kept secret by Defendants and  their co-conspirators, Plaintiffs were unaware of the fact that their Personal Confidential Information had been accessed, downloaded and sold by and to unauthorized individuals and entities, and have been unable to take reasonable and necessary precautions to secure and protect their Personal Confidential Information.

**COUNT I**
**UNJUST ENRICHMENT**

122.    Plaintiffs hereby incorporate by reference thereto the averments of paragraphs 1 through 111 hereof as if fully set forth herein and further allege as follows.

123.    By engaging in the conduct described in this Complaint, defendants have knowingly obtained benefits from Plaintiffs  under circumstances such that it would be inequitable and unjust for these Defendants to retain them.

124.    Certain Defendants have collected payments from sales of Personal Confidential Information belonging to Plaintiffs.  For instance, Rebollo has collected between $50,000 - $70,000 from his sales of Personal Confidential Information.  Siddiqi has collected, at times, four times that amount from such sales.  It is believed and therefore averred that the Doe Defendants have collected similar amounts from their transactions of Personal Confidential Information belonging to Plaintiffs.

125.    The Countrywide Defendants have collected fees and payments from Plaintiffs  that, if they are permitted to retain them, would cause these Defendants to be unjustly enriched.  These fees and payments include application and processing fees relating to applications for mortgages and credit from Countrywide, as well as fees being charged to Plaintiffs for credit monitoring services being offered by Countrywide and its joint venture company, Experian®.

126.    Thus, Defendants will be unjustly enriched if they are permitted to retain the full amounts paid to them either by purchasers of the Personal Confidential Information, or by Plaintiffs, either directly or indirectly.  The claims of Plaintiffs seek to recover the individual payments made by Plaintiffs for the above-described fees and costs, as well as the full amount of any monies paid to any Defendant for the purchase of Personal Confidential Information.

127.    Plaintiffs are therefore entitled to an award of compensatory damages in an amount to be determined at trial, or the imposition of a constructive trust upon the monies derived by Defendants by means of the above-described payments.

WHEREFORE, Plaintiffs respectfully seek the relief set forth below.

## COUNT II
## FRAUD

128.    Plaintiffs hereby incorporate by reference thereto the averments of paragraphs 1 through 117 hereof as if fully set forth here and further allege as follows.

129.    By engaging in the acts and omissions alleged in this Complaint, Defendants have committed fraud on the Plaintiffs.

130.    Defendants have made false and fraudulent statements and material misrepresentations and omissions to Plaintiffs relating to the receipt, storage, maintenance and privacy of their Personal Confidential Information, as well as the time, place and manner of the unauthorized access to their Personal Confidential Information. Defendants' statements were misleading, at best, and materially false and fraudulent, at worst.  In fact, the credit monitoring service being offered by Countrywide requires Plaintiffs to surrender substantial rights that they otherwise would retain, but for their agreement to accept the purportedly "complimentary" credit monitoring service.  Such

rights include, but are not limited to, the right to pursue equitable relief and damages in court against Defendants (as opposed to agreeing to binding arbitration and a limitation of liability which caps any recovery at $100).

131.    Defendants intended that Plaintiffs would rely on their statements, representations and omissions to their detriment.  In particular, the Countrywide Defendants repeatedly made misrepresentations about the security of the Personal Confidential Information they were seeking from Plaintiffs.  Then, after the breach, they stated that the credit monitoring service being offered was "complimentary" and was being provided "at no cost to you over the next two years, " both of which statements were false.  Defendants also have made false and fraudulent statements and material misrepresentations and omissions to Plaintiffs respecting, *inter alia*, when they learned of the unauthorized access to the Personal Confidential Information, whether the same had been sold to others, and the nature and extent of the "credit monitoring service" being provided as an "additional measure of protection" including the fact that Countrywide has a financial interest in ConsumerInfo.com.  Plaintiffs did in fact reasonably rely on the false representations and statements of these Defendants and suffered injury and damages thereby, as more fully set forth herein.

132.    In addition, these Defendants concealed and suppressed and/or omitted material facts as to their knowledge of the unauthorized access to and sale of Personal Confidential Information, and their subsequent actions ostensibly to protect Plaintiffs from the unlawful sale and disclosure of their Personal Confidential Information.

133.    As a result of Defendants' acts of concealment and suppression, and their misrepresentations and omissions, Plaintiffs were unaware of the above-referenced facts,

and were not able to take timely action to protect themselves from the harmful effects of the unauthorized disclosure of their Personal Confidential Information.

134.     As a direct and proximate result of Defendants' fraudulent representations and omissions, and the concealment and suppression of material facts by Defendants, Plaintiffs have suffered and will continue to suffer damages.

WHEREFORE, Plaintiffs respectfully seek the relief set forth below.

## COUNT III
## BREACH OF CONTRACT

135.     Plaintiffs hereby incorporate by reference thereto the averments of paragraphs 1 though 124 hereof as if fully set forth herein and further allege as follows.

136.     At the outset of the application process and once Plaintiffs' mortgages were acquired by Countrywide, Countrywide represented they would take reasonable and necessary precautions to ensure that Plaintiffs' Personal Confidential Information would be protected.

137.     These representations and promises were made to Plaintiffs who relied upon them to their detriment.  Plaintiffs made a mutual exchange of consideration in reliance upon and acceptance of the offer of security by Countrywide.

138.     The failure of Defendants to keep secure from breach the Personal Confidential Information of Plaintiffs constitutes a material breach of the agreement between Countrywide  Plaintiffs.

139.     As a direct and proximate result of the aforesaid breaches of their agreements with Plaintiffs, Plaintiffs have been harmed.

## COUNT IV
## BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

140.    Plaintiffs hereby incorporate by reference thereto the averments of paragraphs 1 though 129 hereof as if fully set forth herein and further allege as follows.

141.    The general duty of good faith and fair dealing in the performance of a contract is found in Restatement (Second) of Contracts, Section 205, which provides that "every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement."

142.    In New Jersey and other States, the duty of good faith is defined as honesty in fact in the conduct or transaction concerned.

143.    The duty to perform contractual obligations in good faith applies where the contract at issue is a consumer contract.

144.    As part of the consumer contract between Plaintiffs and Countrywide, there existed an implied covenant of good faith and fair dealing requiring Countrywide to use its best efforts to protect the Personal Confidential Information of Plaintiffs.

145.    By failing to secure the Personal Confidential Information of Plaintiffs, Countrywide breached the covenant of good faith and fair dealing.

146.    As part of the agreement between Plaintiffs and Countrywide, there existed an implied covenant of good faith and fair dealing requiring Countrywide to deal fairly with the Plaintiffs with regard to timely and reasonable notification as to any breach of the Personal Confidential Information belonging to Plaintiffs.

147.    By failing to timely and reasonably notify Plaintiffs of the breach of Personal Confidential Information by Rebollo, Countrywide breached the covenant of good faith and fair dealing.

148.    Such breaches of the covenant of good faith and fair dealing by

Defendants were the direct and proximate result of injury and damages to Plaintiffs.

149.   As a result of the breaches of the covenant of good faith and fair dealing by Defendants, Plaintiffs have been harmed.

## COUNT V
## BREACH OF STATE SECURITY NOTIFICATION LAWS

150.   Plaintiffs hereby incorporate by reference thereto the averments of paragraphs 1 through 139 hereof as if fully set forth here and further allege as follows.

151.   Upon information and belief, Countrywide first knew, or should have known that Mr. Rebollo had unauthorized access to Plaintiffs Personal Confidential Information in the Spring of 2008.

152.   At least forty-four States, the District of Columbia and Puerto Rico have enacted legislation requiring notification of security beaches involving personal information, including the state of New Jersey, N.J. Stat. 56:8-163

153.   By the acts and omissions set forth herein, Defendants have violated N.J. Stat. 56:8-163.

154.   The New Jersey law, N.J. Stat. 56:8-163, specifically provides that.

"Any business that conducts business in New Jersey … shall disclose any breach of security of those computerized records following discovery or notification of the breach to any customer who is a resident of New Jersey whose personal information was, or is reasonably believed to have been, accessed by an unauthorized person. The disclosure to a customer shall be made in the most expedient time possible and without unreasonable delay, consistent with the legitimate needs of law enforcement, as provided in subsection c. of this section, or any measures necessary to determine the scope of the breach and restore the reasonable integrity of the data system. …

*       *       *

Any business … required under this section to disclose a breach of security of a customer's personal information shall, in advance of the

disclosure to the customer, report the breach of security and any information pertaining to the breach to the Division of State Police in the Department of Law and Public Safety for investigation or handling, which may include dissemination or referral to other appropriate law enforcement entities.

The notification required by this section shall be delayed if a law enforcement agency determines that the notification will impede a criminal or civil investigation and that agency has made a request that the notification be delayed. The notification required by this section shall be made after the law enforcement agency determines that its disclosure will not compromise the investigation and notifies that business or public entity."

N.J.S.A. 56:8-163.

155.   As described in detail above, Countrywide failed to comply with these statutory requisites by, *inter alia*, failing to disclose "in the most expedient time possible and without unreasonable delay" the fact of the Rebollo breach of Personal Confidential Information of Plaintiffs.

156.   It is believed and therefore averred that "the legitimate needs of law enforcement" did not prevent Countrywide from providing expedient notice to Plaintiffs. Specifically, it is believed and therefore averred that a law enforcement agency did not "determine[] that the notification will impede a criminal or civil investigation" and did not make "a request that the notification be delayed" until September 6, 2008.

157.   It is believed, and therefore averred, that Countrywide failed to, "in advance of the disclosure to the customer, report the breach of security and any information pertaining to the breach to the Division of State Police in the Department of Law and Public Safety for investigation or handling."

158.   Because the breach of Personal Confidential Information in this case involved more than 1,000 persons, Countrywide was required to, but failed to, "also

notify, without unreasonable delay, all consumer reporting agencies that compile or maintain files on consumers on a nationwide basis, as defined by subsection (p) of section 603 of the federal "Fair Credit Reporting Act" (15 U.S.C. s. 1681a), of the timing, distribution and content of the notices."

159.    New Jersey law also provides as follows:

"A business … shall destroy, or arrange for the destruction of, a customer's records within its custody or control containing personal information, which is no longer to be retained by the business or public entity, by shredding, erasing, or otherwise modifying the personal information in those records to make it unreadable, undecipherable or nonreconstructable through generally available means."

N.J.S.A. 56:8-162.

160.    Countrywide was no longer required to retain the Personal Confidential Information of Plaintiffs after the application process was complete.  By failing to destroy such information prior to the breach by Rebollo, Countrywide violated New Jersey law.

161.    Because New Jersey provides that violations of the foregoing statutes constitute an unlawful practices within the meaning of the New Jersey consumer fraud law, the foregoing acts and failures to act by Defendants constitute per se violations of New Jersey law.

162.    Defendants acted willfully, knowingly and/or recklessly with respect to its acts and omissions above.

**COUNT VI**
**CONSPIRACY**

163.    Plaintiffs hereby incorporate by reference thereto the averments of paragraphs 1 through 151 hereof as if fully set forth here and further allege as follows.

164.    As set forth more fully above, beginning at least as early as July 2006, the exact date being unknown to Plaintiffs, and continuing thereafter until at least August 2008 when Defendants Rebollo and Siddiqi were captured and criminally prosecuted, Defendants and their co-conspirators entered into an agreement and/or otherwise engaged in a continuing conspiracy to defraud the Plaintiffs by causing Personal Confidential Information of Plaintiffs to be unlawfully accessed, downloaded and sold.

165.    Pursuant to the widespread conspiracy alleged herein and in furtherance thereof, Defendants and their co-conspirators engaged in a wide range of activities, the purpose and effect of which was to defraud the Plaintiffs and to act or take substantial steps in furtherance of the conspiracy.  Those activities include the following:

(a)    Defendants discussed and agreed among themselves and with their co-conspirators that they would arrange for and accomplish the unauthorized access to and copying of the Personal Confidential Information of Plaintiffs;

(b)    Defendants discussed and agreed among themselves and with their co-conspirators that they would arrange for and accomplished the sale of Personal Confidential Information  of Plaintiffs; and

(c)    Defendants discussed and agreed among themselves and with their co-conspirators that they would work together to conceal their scheme from Plaintiffs and withhold material information from Plaintiffs about the scheme.

166.    Defendants performed these acts alleged herein in furtherance of the common plan or design for the conspiracy with knowledge of the injury and damage it would cause to Plaintiffs and with intent to cause such injuries or with reckless disregard for the consequences.

167. As a direct and proximate result of Defendants' conspiracy as alleged herein, Plaintiffs have been injured and damaged, and Defendants are jointly and severally liable for such injuries and damages.

WHEREFORE, Plaintiffs respectfully seek the relief set forth below.

## COUNT VII
## VIOLATIONS OF THE NEW JERSEY AND
## KENTUCKY CONSUMER FRAUD LAWS

168. Plaintiffs hereby incorporate by reference thereto the averments of paragraphs 1 through 156 hereof as if fully set forth here and further allege as follows.

169. Plaintiffs are actual consumers who provided Defendants with their Personal Confidential Information under the express representation that the same would not illegally be accessed, downloaded, saved, distributed, transferred and sold to various individuals and entities not yet fully known. New Jersey and Kentucky have enacted laws to protect consumers against unfair, deceptive or fraudulent business practices, unfair competition and false advertising and unconscionable business practices. New Jersey and Kentucky allow consumers a private right of action under such laws.

170. By the misrepresentations and non-disclosure of material facts alleged above, the Defendants deceived and continue to deceive consumers, such as Plaintiffs . This conduct constitutes unconscionable, unlawful, unfair, deceptive and/or fraudulent business practices within the meaning of the New Jersey Consumer Fraud Act, 56:8-1, *et seq* and the Kentucky Consumer Protection Act, KRS 367.170, *et seq.*

171. As a direct and proximate result of the Defendants' unfair and deceptive trade practices, Plaintiffs have and will continue to suffer damages in an amount to be determined at trial.

## COUNT VIII
## INTENTIONAL VIOLATION OF THE FAIR CREDIT REPORTING ACT

172.    Plaintiff hereby incorporate by reference thereto the averments of paragraphs 1 through160 hereof as if fully set forth here and further allege as follows.

173.    The Fair Credit Reporting Act ("FCRA") was created to "require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit… and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information."  15 U.S.C. § 1681(b).

174.    The FCRA imposes the following duty: "Every consumer reporting agency shall maintain reasonable procedures designed to… limit the furnishing of consumer reports to the purposes listed under section 604 [15 U.S.C. § 1681(b)]." 15 U.S.C. § 1681e(a).  Section 604, 15 U.S.C. § 1681(b), sets forth various permissible purposes for the furnishing of consumer reports.  Defendants' disclosure of consumer information  (*i.e.* Personal Confidential Information) to unauthorized third parties did not comply with any of the permissible purposes set forth in 15 U.S.C. § 1681(b).

175.    The FCRA defines "consumer reporting agency" as follows:

> The term 'consumer reporting agency' means any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of ***assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties,*** and which uses any means
>
> or facility of interstate commerce for the purpose of preparing or furnishing consumer reports.

15 U.S.C. § 1681(b) (emphasis added).

176.    The FCRA defines "consumer report" as follows:

The term 'consumer report' means any written, oral, or other communication of any information by a consumer reporting agency *bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living* which is used or expected to be used or collected in whole or in part for the purpose of serving as a *factor in establishing the consumer's eligibility for*

> (A) *Credit* or insurance to be used primarily for personal, family, or household purposes;

> (B) employment purposes; or

> (C) any other purpose authorized under section 604 [15 U.S.C. § 1681(b)].

15 U.S.C. § 1681a(d)(1) (emphasis added).

177.    Plaintiffs are "consumers" or "persons" as defined and construed under FCRA (15 U.S.C. § 1681a(b) & (c)).

178.    Defendants are consumer reporting agencies under the FCRA, as they, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engage (and/or have regularly engaged in the past) in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and use interstate commerce for the purpose of preparing or furnishing consumer reports.

179.    Specifically, the Countrywide Defendants are a "consumer reporting agencies" under the FCRA, as indicated on Countrywide's website.  On the page titled "privacy and security in the countrywide family" on Countrywide's website, Countrywide states:

> To fund and service your loan, comply with government regulations, improve our products and services, and better understand your financial needs, we collect and maintain customer and former customer data.  We collect information:

> > • You provide us on applications and other forms (such as your phone, Social Security and account numbers, assets, income and

employment history);

- About your transactions with us (such as your loan balance, payment history and other account information);

- About your credit history from a credit reporting agency;

- About you or your property from business partners and service providers (such as a property appraisal, purchase contract or membership number);

- About you or your property from business partners and service providers (such as a property appraisal, purchase contract or membership number), or from current or past employers or other financial institutions when verifying information you provide on an application or other form; and

- About you from consumer purchasing and census data providers to develop competitive marketing programs for our customers.

We disclose some of this data to third parties (such as credit reporting agencies, regulators and loan investors).  We may share some of this information with companies performing services on our behalf (such as the vendor who prepares our monthly statements).  These service providers agree to keep the information confidential and not use it for any other purpose."

\* \* \*

To offer and recommend valuable products and services, we may share customer and former customer information within our family of companies and the other Bank of America companies.  The other Bank of America companies include financial service providers, such as a brokerage company and a credit card company, and nonfinancial companies such as operations and servicing subsidiaries.

*See* "privacy and security in the countrywide family" available at

http://my.countrywide.com/privacy.aspx.  (Attached hereto as Exhibit "A").

180.    As consumer reporting agencies, Defendants are required to maintain reasonable procedures designed to limit the furnishing of consumer reports to the permissible purposes outlined under FCRA.  *See* 15 U.S.C. § 1681e.

181.    Defendants' failed to maintain such reasonable procedures designed to

limit the furnishing of consumer reports to the permissible purposes outlined under FCRA by negligently,  willfully and/or recklessly failing to properly: (i) supervise their employees; (ii) monitor for unauthorized access to or use of consumer information; and/or (iii) adopt procedures to prevent or detect unauthorized access to or disclosure of consumer information.

182.    The FCRA states the following with respect to damages:

(a) Any person who willfully fails to comply with any requirement imposed under this title with respect to any consumer is liable to that consumer in an amount equal to the sum of

(1)(A) any actual damages sustained by the consumer as a result of the failure or damages of not less than $100 and not more than $1,000
…

(B) Such amount of punitive damages as the Court may allow; and

(C) in the case of any successful action to enforce any liability under this section, the costs of the action together with reasonable attorney's fees as determined by the court.

15 U.S.C. § 1681n(a).

183.    Plaintiffs  have been damaged by Defendants' actions and failures to act. As a result, Plaintiffs  are entitled to actual damages sustained or statutory damages of not less than $100 and not more than $1,000, as well as punitive damages, litigation costs, and attorney's fees.

## COUNT IX
## NEGLIGENT VIOLATION OF THE FAIR CREDIT REPORTING ACT

184.    Plaintiffs  hereby  incorporate  by  reference  thereto  the  averments  of

paragraphs 1 through 172 hereof as if fully set forth here and further allege as follows.

185.    Defendants engaged in at least negligent, if not willful or reckless, conduct in violating FCRA.

186.    In negligent disregard for the rights of the Plaintiffs, Defendants failed to maintain reasonable procedures designed to limit the furnishing of consumer reports to the permissible purposes outlined in the FCRA by failing to properly: (i) supervise their employees; (ii) monitor for unauthorized access to or use of consumer information; and/or (iii) adopt procedures to prevent or detect unauthorized access to or disclosure of consumer information.

187.    Defendants and their employees obtained Plaintiffs' Private Confidential Information, and sold or disseminated it to unauthorized third parties for no permissible purpose under the FCRA.

188.    The Countrywide Defendants are responsible for the employees' actions as their agents and employees, acting within the scope of their employment.

189.    Defendants' negligent conduct allowed their employees to obtain Plaintiffs' Plaintiffs' consumer reports and Personal Confidential Information and sell it to third parties without the consent of Plaintiffs, and for no permissible purpose under FCRA.

190.    The FCRA states the following with respect to damages:

(a) Any person who willfully fails to comply with any requirement imposed under this title with respect to any consumer is liable to that consumer in an amount equal to the sum of

(1)(A) any actual damages sustained by the consumer as a result of the failure or damages of not less than $100 and not more than $1,000
…

(B) Such amount of punitive damages as the Court may allow; and

(C) in the case of any successful action to enforce any liability under this section, the costs of the action together with reasonable attorney's fees as determined by the court.

15 U.S.C. § 1681n(a).

191.    Plaintiffs   have been damaged by Defendants' actions.   As a result, Plaintiffs   are entitled to actual damages sustained, as well as litigation costs and attorney's fees.

WHEREFORE, Plaintiffs respectfully seek the relief set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs  request the Court to enter the following relief:

a.    Declare unlawful the acts and practices alleged herein, and enjoin the Defendants from committing the acts complained of herein;

b.    Enter judgment against all Defendants for the violations alleged herein;

c.    Award the actual damages incurred by Plaintiffs as a result of the wrongful acts complained of, along with pre-judgment and post-judgment interest at the maximum rate allowed by law;

d.    Award statutory damages set forth herein;

e.    Award of treble damages or multiple damages by operation of law;

f.    Award punitive damages;

g.    Award Plaintiffs the costs of this action, including reasonable attorney's fees, and, where applicable, expert fees; and

h.      ward such other and further relief as the Court may deem just and

appropriate.

## JURY DEMAND

Plaintiffs demand a trial by jury of all issues so triable in this cause.

Respectfully submitted,


Dated: March 2, 2012                               _____/s/_____
                                                   Stacey A. Blankenship, Esquire
                                                   Doug Moore, Esquire
                                                   **DENTON & KEULER**
                                                   555 Jefferson Street
                                                   Suite 301
                                                   Paducah, KY 42001

                                                   Donald E. Haviland, Jr., Esquire
                                                   Michael J. Lorusso, Esquire
                                                   **HAVILAND HUGHES**
                                                   111 South Independence Mall East,
                                                   Suite 1000
                                                   Philadelphia, PA 19106
                                                   (215) 609-4661 telephone

                                                   **ATTORNEYS FOR PLAINTIFFS,
                                                   MATTHEW AND DANIELLE HOLMES,
                                                   JOHN AND TERRA STIERS**